**V & S ProGALV, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 97–5833, 97–5919.

United States Court of Appeals, Sixth Circuit.

Argued June 16, 1998.

Decided Feb. 19, 1999.

---

272

Andrew C. Smith (argued and briefed), Thomas B. Langlas (briefed), Vorys, Sater, Seymour & Pease, Columbus, OH, for Petitioner/Cross–Respondent.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel (briefed), Charles P. Donnelly, Jr. (briefed), Vincent J. Falvo, Jr. (argued and briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Before: WELLFORD, MOORE, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. WELLFORD, J. (pp. 286–89), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

CLAY, Circuit Judge.

V & S ProGalv, Inc. ("ProGalv"), Petitioner and Cross–Respondent, a custom steel galvanizing company located in Columbus, Ohio, petitions this Court for review of the May 30, 1997, decision of the National Labor Relations Board ("the Board"), Respondent and Cross–Petitioner, finding that ProGalv interfered with the statutory rights of ProGalv's employees in violation of § 8(a)(1), (2), and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 141 *et seq.* The Board cross-applies for enforcement of its order. Because we find that there is substantial evidence to support the Board's findings of fact and that there are no errors of law in the decision, ProGalv's petition for review is **DENIED** and the Board's Order is **ENFORCED.**

## BACKGROUND

### *Procedural History*

Administrative Law Judge Lawrence W. Cullen ("the ALJ"), presided over a hearing in cases numbered 17–CA–18223, 17–CA–18273–2, 17–CA–18319, and 17–CA–18401–2, from March 4 to March 6, 1996 which were filed by the Board against ProGalv following

an investigation of unfair labor practice charges alleged by Shopmen's Local Union No. 620 of the International Association of Bridge, Structural and Ornamental Iron Workers ("the Union"). On November 25, 1996, the ALJ issued his decision finding that ProGalv had violated § 8(a)(1),(2) and (5) of the Act. Thereafter, pursuant to § 102.46 of the Board's Rules and Regulations, ProGalv submitted its Exceptions and Memorandum in Support of its Exceptions to the ALJ's decision. The Board affirmed the ALJ's recommended order, as modified. On June 30, 1997, ProGalv filed this petition to Review and Set Aside the May 30, 1997, Order, and on July 28, 1997, the Board filed this Cross–Application for Enforcement of the Board's Order.

## Facts

ProGalv was formed in 1992 to provide custom steel galvanizing for customers located in the Southwestern part of the United States. Shortly after its formation, ProGalv purchased an Oklahoma manufacturing facility previously operated by Union Metal Corporation ("Union Metal"). At that time, ProGalv agreed to assume the existing Collective Bargaining Agreement ("CBA") between Union Metal and Shopman's Local Union 467 of the International Association of Bridge, Structural & Ornamental Ironworkers, subject to certain modifications.[1]

The CBA expired at the end of June of 1995. In the Spring of 1995, Keith Griggs (a company leadman) who reported directly to Johnnie Kelley[2] (company president) each day for instructions, found an envelope in his truck in the company parking lot, with the words "National Labor Relations Board" on it. Inside the envelope was a piece of paper that said, "I no longer want Local 620 [the Union] to represent me," with spaces for employees to sign. Griggs showed the paper to Kelley, asked Kelley if he had put it in Griggs' truck, and Kelley responded in the negative and that he could not talk about it or he would get in trouble. However, Kelley told Griggs to see if he could get some employees to sign the petition. Some employees signed the petition, Griggs showed it to Kelley, and Kelley instructed Griggs to try and get more signatures.

In June of 1995, ProGalv and the Union met to negotiate a new CBA; however, negotiations were unsuccessful, and Union representative David Turnbull advised the employees to strike. Several employees returned to work during the first two weeks of the strike. Some of the employees were concerned that the Union might impose fines against them for crossing the picket line. Upon Kelley's advice, these employees inquired about the imposition of such fines, and were told by the Board's General Counsel that such fines could be imposed.

Thereafter, Kelley told Griggs and another leadman, Clifford Wallen, that they should try to circulate another petition to oust the Union. Griggs and Wallen did so, but failed to achieve the requisite number of signatures, and so they circulated another petition on Kelley's instruction. By mid-July, Griggs and Wallen had collected signatures from eighteen of ProGalv's production employees on three separate petitions, and delivered them to Kelley. On July 27, 1995, ProGalv's attorneys sent a letter to the Union advising it that the employees no longer wanted representation. On July 31, the Union sent a revised bargaining proposal to ProGalv; however, ProGalv reaffirmed its withdrawal of Union recognition and did not respond to further communications.

Kelley discussed the formation of an "in-house" union to discuss various workplace issues with the management. Kelley agreed to the formation of such a committee, told Griggs as to how many members the committee should consist, and as to how they should be chosen. Chief Executive Officer Harvey Morgan replaced Kelley in terms of handling the day-to-day operations. Morgan met with the in-house committee, but discontinued do-

1. Local 467 later merged into Local 620, which is referred to as "the Union" in this opinion.

2. In its brief on appeal to this Court, ProGalv spells Kelley's name as "Kelly." However, in the Board's order, the name is spelled as "Kelley." For consistency, we will follow the spelling set forth in the Board's order.

ing so after the Union filed unfair labor practice charges with the Board.

Griggs and Wallen reported to Morgan that some of the employees were thinking of bringing the Union back, and Morgan responded by threatening to close down the plant if such an event occurred. Thereafter, Griggs provided the Board with an affidavit in connection with the Board's investigation, and when he returned from providing the affidavit, Morgan asked Griggs if he had "fun" talking to the Board.

## DISCUSSION

▮▮▮ ProGalv argues that the Board's order should be set aside inasmuch as there was not substantial evidence presented to support a finding that it violated §§ 8(a)(1),(2) and (5) of the Act. The scope of this Court's review of the Board's findings is limited:

A reviewing court may not disturb the Board's findings of fact where there is substantial evidence on the record considered as a whole to support the Board's findings. The Board's findings must be set aside when the record demonstrates that the Board's decision is not "justified by a fair estimate of the worth of the testimony of witnesses" or by the Board's "informed judgment on matters within its special competence or both." When there is conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor.

The Board's application of the law to particular facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo*. *Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision.* The appellate court should consider the evidence contrary to the Board's conclusions, but may not conduct a de novo review of the record.

If the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has "no reasonable basis in law."

*Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 295 (6th Cir.1985) (emphasis added; citations omitted).

## I. Violation of Section 8(a)(1)

ProGalv first argues that substantial evidence was not presented to support the Board's finding that it violated § 8(a)(1) of the Act. We disagree.

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C.A. § 157 (West 1998). Section 8(a)(1) of the Act implements those guarantees by making it an unfair practice to "interfere with, restrain, or coerce employees in the exercise of" their § 7 rights. 29 U.S.C.A. § 158(a)(1) (West 1998).

In *NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105–06 (6th Cir.1987) (citations omitted), this Court stated that:

The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights. In making this determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees. This assessment should take into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear."

In this case, the Board found that ProGalv violated § 8(a)(1) of the Act by:

(a) Instigating and soliciting the employee drafting and circulation of a petition seeking the decertification of the Union.

(b) Promising benefits in the form of institution of a monthly matching contribution savings plan for employees conditioned on employees' rejection of the Union as their collective bargaining representative.

(c) Threatening employees with loss of benefits if the employees selected the Union as their collective-bargaining representative.

(d) Threatening employees with closure of its plant if the employees selected the Union as their collective-bargaining representative.

(e) Interrogating an employee with regard to his cooperation in the Board's investigation in this case.

J.A. at 11. We will address each of the Board's findings of proscribed activity under § 8(a)(1) as follows.[3]

### (a) Petition Seeking Decertification of the Union

 "It is as violation of Section 8(a)(1) of the Act for an employer to sponsor and participate in the circulation of a petition among employees withdrawing support from a union." *NLRB v. Allen's I.G.A. Foodliner*, 651 F.2d 438, 440 (6th Cir.1981); *see NLRB v. Priced–Less Discount Foods, Inc.*, 405 F.2d 67, 69 (6th Cir.1968) (bargaining order upheld because the company assisted in the preparation and mailing of letters withdrawing union support). "Conversely, in *Landmark Int'l Trucks, Inc. v. NLRB*, 699 F.2d 815 (6th Cir.1983), we reasoned that 'an employer may bring to the attention of its employees their right to resign from a union ... so long as the communication is free from any threat or coercion.'" *Adair Standish Corp., v. NLRB*, 912 F.2d 854, 860 (6th Cir. 1990) (quoting *Landmark*, 699 F.2d at 820). Here, we find that ProGalv's conduct fell within the impermissible activity described in *Allen's I.G.A.*, as opposed to the permissible conduct described in *Landmark*.

The Board adopted the ALJ's finding that Griggs' testimony was more credible than that of President Kelley:

Griggs testified that in the spring (March or April) of 1995, he found a blank petition to get rid of the Union in an envelope marked NLRB in his truck as he was leaving work at the end of the day. The next day he asked President Kelley if he had put it in his truck and Kelley said, "no," and also said he could not talk about it or it would "get him in trouble." Griggs showed Kelley the petition and Kelley looked at it and told Griggs to see if he could obtain some signatures on it. Griggs took it out into the shop and attempted to obtain signatures. He signed it and obtained additional signatures. He then "passed it around some more and then I couldn't get anybody else to sign it." He put the petition in his notebook in the office and Kelley told him to try to get additional signatures and when he went to retrieve the petition, he was unable to find it. Kelley was called by the Respondent [NLRB] at the hearing and corroborated the foregoing testimony part but denied having given Griggs any instructions with regard to the petition.

J.A. at 8.

 Based upon this finding, substantial evidence was presented to support the Board's conclusion that ProGalv violated § 8(a)(1) in "instigating and soliciting the employee drafting and circulation of a petition seeking the decertification of the Union." It is not this Court's function to resolve questions of fact and credibility when there is conflict in the testimony. *Turnbull Cone Baking Co.*, 778 F.2d at 295. This Court ordinarily will not disturb credibility evalua-

---

**3.** The Board contends that ProGalv failed to properly challenge the Board's finding as to § 8(a)(1) violations (a) and (b) as listed above (the decertification violation and the promise violation) by not specifically addressing the same on appeal. Citing *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 240–41 (6th Cir.1983), the Board therefore argues that ProGalv has waived any challenge to these findings, and that the Board is entitled to summary enforcement of the portions of its order that are based on those uncontested findings. We find that, although somewhat inartfully constructed, ProGalv did address and challenge the Board's finding regarding the decertification petition as well as the finding regarding the inducement to abandon the Union in its Brief on appeal. (*See* ProGalv's Final Brief on Appeal, pp. 8–20, 31–32). Therefore, we will consider ProGalv's challenges on these findings.

tions because the ALJ was in the superior position of observing the witness' demeanor. *Id.* Here, the ALJ was impressed by Griggs' demeanor and found him to be a "truthful" witness. Therefore, because Griggs' testimony indicated that President Kelley played an affirmative role in procuring signatures on the decertification petition, as well as in instigating the petition by leaving it in an envelope in Griggs' truck (if not physically placing the petition there himself, at least by authorizing someone to do so), substantial evidence was presented to uphold this finding and conclusion. *See NLRB v. American Linen Supply Co.,* 945 F.2d 1428, 1433–34 (8th Cir. 1991) (citing *Allen's I.G.A.,* 651 F.2d at 440) (the company violated § 8(a)(1) by soliciting at least one employee to withdraw from the union and twenty-six such withdrawals were subsequently made); *Adair,* 912 F.2d at 860 (the company violated § 8(a)(1) by posting a notice apprising union members of their right to revoke their authorization cards, and by informing the members where to procure forms to do so); *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1299–1300 (6th Cir. 1988) (the fact that the decertification petition may have originated with an employee did not purge the taint of the company's act of drafting and circulating the petition in violation of § 8(a)(1)); *Allen's I.G.A.,* 651 F.2d at 441 (the company violated § 8(a)(1) by sponsoring and participating in the circulation of a decertification petition).

■■■ ProGalv argues that this finding should not be upheld because Griggs' testimony lacked credibility and because evidence of the "mysterious—and (ostensibly) lost—envelope" in Griggs' truck is suspect. However, as noted above, issues of witness' credibility should not be disturbed by this Court because the ALJ sits in the superior position of observing the witness as he testifies. *Turnbull Cone Baking Co.,* 778 F.2d at 295. In addition, circumstantial evidence, such as the presence of the envelope containing the decertification petition appearing in Griggs' truck, may be considered substantial evidence sufficient to support a finding of a § 8(a)(1) violation. *See NLRB v. Price's Pic–Pac Supermarkets, Inc.,* 707 F.2d 236, 240 (6th Cir.1983); *NLRB v. G. & S. Metal Prods.,* 489 F.2d 441, 443 (6th Cir.1973).

ProGalv also argues that Kelley's role in the drafting and circulation of the decertification petition merely amounted to ministerial assistance, and was therefore proper. ProGalv contends that Kelley simply provided information in response to employee questions as to whether they could be fined for crossing the picket line, and as to how the language of the decertification letter should read. We disagree inasmuch as this Court has found, under similar facts, that such "ministerial assistance" rises to the level of coercive conduct sufficient to constitute unfair labor practice. *See Indiana Cal–Pro, Inc.,* 863 F.2d at 1299–1300. ProGalv's reliance upon *Landmark Int'l Trucks, Inc.,* 699 F.2d at 820 is misplaced because in that case, the Court held that an employer may bring to the attention of its employees their right to resign from the union, but the employer must do so in an atmosphere that is not coercive. Here, the totality of the circumstances indicates a coercive environment, where the petition was found in Griggs' truck and Kelley instructed Griggs to circulate another petition when the original was lost. *See Okun Bros. Shoe Store, Inc.,* 825 F.2d at 105–06 (conduct is considered in the total context in which it occurred). Accordingly, we conclude that ProGalv's argument is without merit.

### (b) Promising Benefits

■■■ The Board also adopted the ALJ's finding that ProGalv violated § 8(a)(1) by promising its employees an additional benefit if they rejected the Union:

> I further find that Griggs' testimony should be credited with respect to Kelley's promise of benefits by promising to Griggs the consideration of the institution of a monthly matching contribution savings plan if the employees rejected the Union (telling Griggs that his idea sounded good but would have to be discussed after all this was over). This promise by Kelley also violated Section 8(a)(1) of the Act.

J.A. at 10. ProGalv contends that this finding should not be upheld because Kelley testified that the idea—that had the employees rejected the Union the $25 that had

previously been deducted from their paychecks for Union dues would instead be deducted and placed in a savings fund and matched by ProGalv—did not arise until *after* the decertification petition was submitted. Alternatively, ProGalv argues that, even if Griggs' recollection of when his conversation with Kelley took place is correct (i.e., before the decertification petition was submitted), Kelley's statement that, "[the matching plan] sounded like a good idea, but we'd have to talk about it after all of this was over," did not rise to the level of an inducement for the employees to decertify the union; rather, it was a mere promise to talk about the idea in the future.

We disagree with ProGalv's contention where the Board's finding is supported by substantial evidence. As stated, Griggs' version of the timing of the promise made by Kelley should be credited and accepted by this Court because the ALJ found Griggs a more credible witness. *Turnbull Cone Baking Co.*, 778 F.2d at 295 (credibility determinations should not be disturbed by this Court); *Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288, 1290 (6th Cir.1984) (demeanor-based credibility determinations are entitled to considerable weight). With that in mind, Kelley's statement clearly falls under the realm of substantial evidence of proscribed activity under § 8(a)(1). We find that this is particularly so when considering this Court's holding in *Allen's I.G.A.*, 651 F.2d at 440–41:

> The granting or withholding of benefits in order to discourage union activity is proscribed by Section 8(a)(1) of the Act. In *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964), the Supreme Court stated: "The danger inherent in well-timed increases in benefits is the suggestion of the fist inside the velvet glove. Employees are not likely to miss the inference that the source from which future benefits must flow and which may dry up if it is not obliged." Applying these principles, we hold that substantial evidence supports the Board's finding that Allen's violated Section 8(a)(1) of the Act by sponsoring and participating in the circulation of the petition among employees withdrawing support from the Union and by announcing improved benefits in order to undermine the Union.

Likewise, here it is unlikely that the employees in this case would have missed the inference held in Kelley's statement that if they decertified the Union, it would result in an increased benefit. Accordingly, ProGalv's argument must fail.

### (c) Threat of Loss of Benefits ; and

### (d) Threat of Plant Closure

The Board adopted the ALJ's finding that a statement made by Morgan to Griggs—in response to Griggs' statement that the employees were thinking of bringing back the Union—constituted coercive and proscribed activity under § 8(a)(1). Morgan's statement, which the ALJ found to be coercive, was that "Werner would lock the doors on this place and they could kiss the investment fund good bye." Specifically, the ALJ found that

> under either Griggs' or Morgan's version of the conversation concerning the locking of the gates if the employees sought to bring the Union back, that Respondent [ProGalv] violated Section 8(a)(1) of the Act as it is clear this was a threat of plant closure if the employees sought to exercise their Section 7 rights to be represented by the Union. I further find that Morgan did state as testified by Griggs that the employees could "kiss the investment fund goodbye" and that Respondent [ProGalv] thereby also violated Section 8(a)(1) as this constituted a threat of the loss of a future benefit.

J.A. at 10. ProGalv argues that these findings should not be upheld because even if Morgan made the statement as Griggs contends, the statement was nothing more than a single offhand remark that cannot rise to the level of coercion in violation of § 8(a)(1). In support of its claim, ProGalv relies upon a recent decision from the Court Appeals for the Seventh Circuit, where the Court found that a supervisor's comment, "I hope you guys are ready to pack up and move to Mexico," did not constitute a threat of plant closure. *See NLRB v. Champion Labs.*, 99 F.3d 223, 229 (7th Cir.1996).

█ It is well settled that an employer violates § 8(a)(1) of the Act by threatening to withhold benefits and by threatening to close the business for engaging in union activities. *See NLRB v. Hovey Elec., Inc.,* 964 F.2d 543, 546 (6th Cir.1992); *Indiana Cal–Pro, Inc.,* 863 F.2d at 1297; *Price's Pic–Pac Supermarkets,* 707 F.2d at 239–40; *Allen's I.G.A.,* 651 F.2d at 440–41. As such, Morgan's threat, made in response to Griggs' statement that some of the employees were thinking of bring back the Union, was substantial evidence of this type of proscribed activity. ProGalv argues that Morgan's single offhanded remark should not be considered coercive; however, when viewed under a totality of the circumstances, Morgan's statement could be considered coercive by a reasonable mind. *See Okun Bros. Shoe Store, Inc.,* 825 F.2d at 105–06 (conduct must be viewed in total context); *Turnbull Cone Baking Co.,* 778 F.2d at 295 (evidence is considered substantial if it is adequate in a reasonable mind). Although ProGalv argues that Morgan made the comment in an offhanded fashion and that it therefore cannot be considered coercive, ProGalv's argument fails where this Court has found that even when such a threat is made in a seemingly lighthearted fashion, it still rises to the level of coercive because, in reality, threatening comments are often couched in ostensibly friendly or even humorous terms. *See NLRB v. Homemaker Shops, Inc.,* 724 F.2d 535, 550 (6th Cir.1984).

Furthermore, ProGalv's reliance upon the Seventh Circuit's decision in *Champion Labs.,* 99 F.3d at 229, (finding that, although coming close to the edge of what is acceptable under the Act, a single, offhanded remark regarding a plant closure if the employees voted for the union did not rise to the level of proscribed coercive activity), is misplaced. The context in which the threatening statement was made in *Champion Labs.* is distinguishable from that of the instant case.[4] For example, in *Champion Labs.,* the

court found that the statement about moving the facility to Mexico was made by a supervisor in the context of a casual banter, and was nothing more than a paraphrase of what another—admittedly anti-union person—had already said. *Id.* However, the context in which the instant threat of plant closure was made was in response to a serious comment; was not done in a joking or paraphrased manner; and was made by the chief executive officer (Morgan) and not a mere supervisor. Furthermore, for reasons set forth in Judge Ripple's dissent to the *Champion Labs.* majority decision, *see supra* note 4, we are not persuaded by the Seventh Circuit's decision. Accordingly, ProGalv's claims regarding these findings fail.

#### (e) Interrogating an Employee Regarding Union Involvement

█ Finally, the Board accepted the ALJ's finding that ProGalv violated § 8(a)(1) when Morgan interrogated Griggs: "I find that based on my crediting of Griggs' testimony concerning his interrogation by Harvey Morgan about the NLRB investigation that Respondent [ProGalv] violated Section 8(a)(1) of the Act." J.A. at 10.

ProGalv argues that this finding should not be upheld because Morgan's question to Griggs did not rise to the level of coercive interrogation. Specifically, ProGalv argues that Morgan's question to Griggs, "Oh, by the way, did you have fun talking with the NLRB yesterday?," is not coercive conduct, but rather a "smart-aleck" throw-away line that did not have any negative effect. The Board argues that the circumstances under which the question was asked clearly amount to a § 8(a)(1) violation of coercive conduct: Morgan, as chief executive officer, questioned Griggs when he returned to the plant after providing the Board with an affidavit, and added "Boy, [union representative] Turnbull and them [union] guys are going to hang you

4. It should also be noted that in *Champion Labs.,* Judge Ripple dissented from the majority's decision on this issue. 99 F.3d at 230–31 (Ripple, J., concurring in part, dissenting in part). In Judge Ripple's opinion, the Board's finding that the threat of plant closure constituted impermissible conduct under § 8(a)(1) should not have been disturbed on appeal because the ALJ was in the superior position of assessing credibility, demeanor, and the total context under which the statement was made. *Id.* Here, the ALJ's assessment should not be disturbed for the same reason.

out to dry," and did so in a sarcastic tone. We agree with the Board.

 It is well-settled that an employer violates the Act by interrogating its employees about their union activities, *NLRB v. E.I. DuPont De Nemours,* 750 F.2d 524, 527 (6th Cir.1984). "While questioning employees about a union is not per se unlawful, the Board's assessment of coercive effect, if reasonable, should be sustained." *Price's Pic-Pac Supermarkets, Inc.,* 707 F.2d at 239 (citations omitted). The basic test used by the Board for evaluating the legality of an interrogation is " 'whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act.' " *Dayton Typographic Serv., Inc. v. NLRB,* 778 F.2d 1188, 1194 (6th Cir.1985) (quoting *Rossmore House,* 269 N.L.R.B. No. 198, 116 L.R.R.M. 1025, 1026 (1984) *enforced sub nom. Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB,* 760 F.2d 1006 (9th Cir. 1985)). Furthermore, "[w]hen assessing the coercive tendency of an interrogation, the NLRB looks at, among other things, the background, the nature of the information sought, the questioner's identity, and the place and method of interrogation." *Id.*

Here, the question was asked in a background cloaked with tension regarding the Union's decertification and question as to whether it would be reinstated; it was asked in a sarcastic fashion and sought information regarding Griggs' activity at the NLRB; chief executive officer Morgan was the person asking the sarcastic question; and the questioning took place at the plant. Under these facts, substantial evidence was presented for the ALJ to find that Morgan's questioning amounted to coercive interrogation. *See E.I. DuPont De Nemours,* 750 F.2d at 528 (finding that a supervisor's act of questioning an employee as to why he supported the union, as well as the supervisor's statement to the employee that he had supervisor potential if he did not support the union, rose to the level of coercive conduct). As ProGalv claims, although it is true that "[i]nfrequent,

isolated and innocuous inquires of a relatively small number of employees, standing alone, do not constitute interference, restraint or coercion within the meaning of section 8(a)(1) of the Act," *Homemaker Shops, Inc.,* 724 F.2d at 548–49, because Morgan's question to Griggs had the probable effect of interfering with Griggs' free exercise of his right to organize and bargain collectively, the question at issue should be considered proscribed conduct. *Id.* Accordingly, ProGalv's claim on this finding is also without merit.

 In summary, the ALJ's findings, as adopted by the Board, regarding ProGalv's violations of § 8(a)(1) of the Act, were supported by substantial evidence under a totality of the circumstances and should therefore be upheld. In arriving at this conclusion, we have considered, as we must, the axiom that: "It is hornbook law of course that we must uphold and enforce the decision of the Board if substantial evidence on the record as a whole supports its findings, even though we might justifiably have made a different choice had the matter been before the court *de novo.*" *Okun Bros. Shoe Store, Inc.,* 825 F.2d at 105.

## II. Violation of Sections 8(a)(1) and (5).[5]

ProGalv argues that the Board's finding that it violated § 8(a)(1) and (5) of the Act by withdrawing recognition from and refusing to bargain with the Union, and by unilaterally changing the terms and conditions of employment without affording the Union notice and opportunity to bargain, was not supported by substantial evidence. We disagree.

The ALJ found that ProGalv violated § 8(a)(1) and (5) by engaging in the following proscribed activity:

> Respondent's [ProGalv's] withdrawal of recognition and subsequent refusals to bargain with the Union were violative of Section 8(a)(5) and (1) of the Act. Moreover there was no good-faith doubt as to the Union's continuing majority status as the

---

5. Because the Board found that ProGalv violated § 8(a)(5) by withdrawing recognition from and refusing to bargain with the Union, as well as by making unilateral changes, and because these issues are dealt with in tandem by § 8(a)(5), we will consider them together here.

withdrawal of recognition did not occur in a context free of unfair labor practices.

\* \* \* `

It is also clear and I find that Respondent violated Section 8(a)(5) and (1) of the Act by instituting unilateral changes in the terms and conditions of employment without giving notice to the Union and affording the Union an opportunity to bargain on the following unilateral changes:

(1) Posting a seniority list which no longer considered time worked at Union Metal in calculating seniority.

(2) Instituting the retirement program and soliciting the employees to sign up for the new retirement program.

(3) Requiring employees to work mandatory overtime without giving them 4 hours' notice as required under the existing terms and conditions of employment in the expired labor agreement and its final offer.

(4) Instituting a partial layoff.

J.A. at 10. ProGalv argues that it properly withdrew its recognition of the Union because the Union did not have majority support. ProGalv in fact received petitions signed by over fifty percent of the bargaining unit decertifying the Union. However, the Board held that ProGalv's withdrawal of recognition was improper because the petitions could not be relied upon with any sort of good-faith belief inasmuch as they were tainted by ProGalv's previous unlawful conduct. *See supra* Issue I. and text discussing ProGalv's unlawful actions in drafting and circulating the petitions for decertification of the Union. Simply put, the Board held that the petitions could not be relied on as basis for good-faith doubt as to majority status because they were tainted by ProGalv's unfair labor practices.

In general, a union is entitled to an irrebuttable presumption of majority status for the first year following its certification by the Board, or during the term of any collective bargaining agreement to which it is a party. Thereafter, the presumption of majority status becomes rebuttable

To rebut the presumption and withdraw recognition of a union, an employer has the burden of demonstrating (1) that the union in fact did not enjoy majority support; or (2) that it had a good-faith belief, founded on a sufficient objective basis, that the union no longer represented a majority of the employees. "This good faith belief must be supported by 'objective considerations which are clear, cogent and convincing.' "

A good-faith doubt as to the union's continuing majority status can arise only in a context free of the coercive effect of unfair labor practices. Therefore, an employer cannot lawfully withdraw recognition from a union if it has committed as yet unremedied unfair labor practices that reasonably tended to contribute to employee disaffection from the union.

*Columbia Portland Cement Co. v. NLRB,* 979 F.2d 460, 464 (6th Cir.1992) (citations omitted).

■ Here, ProGalv withdrew recognition from the Union on July 27, 1995, on the basis of the petition(s) having been signed by a majority of unit employees stating that they no longer desired Union representation. However, because ProGalv interfered with its employees' rights to be represented by the Union, the petition was tainted and ProGalv therefore cannot in fact rely upon the petition as the basis of Union decertification. *See Columbia Portland Cement Co.,* 979 F.2d at 464; *Garrett R.R. Car & Equip. v. NLRB,* 683 F.2d 731, 737–38 (3rd Cir.1982) (company could not rely upon petition that had been tainted by unfair labor practices); *supra* Issue I. and accompanying text discussing ProGalv's unfair labor practices that reasonably tended to contribute to employee disaffection from the Union, such as instigating and soliciting the employee drafting and circulation of petition seeking the decertification of the Union; promising benefits in the form of institution of a monthly matching contribution savings plan conditioned upon the employees' rejection of the Union; threatening the employees with loss of benefits and plant closure; and interrogating an employee with regard to his cooperation in the Board's investigation in this case. Furthermore, be-

cause the withdrawal from the Union did not occur in a context free of unfair labor practices, ProGalv cannot be found to hold a good-faith doubt as to the Union's continued majority status. 979 F.2d at 464. (" 'an employer cannot lawfully withdraw recognition from a union if it has committed as yet unremedied unfair labor practices that reasonably tended to contribute to employee disaffection from the union.' ") (quoting *NLRB v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1014 (5th Cir.1990)). As such, substantial evidence was presented to uphold this finding.

Turning now to the Board's finding that ProGalv violated § 8(a)(5) and (1) by instituting unilateral changes in the terms and conditions of employment without giving notice to the Union and affording the Union an opportunity to bargain on the changes, we find that substantial evidence was presented to support this finding as well. In *NLRB v. Plainville Ready Mix Concrete Co.,* this Court stated:

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of its employees.... " Thus, unilateral action with respect to any mandatory subject of bargaining is prohibited "for it is a circumvention of the duty to negotiate which frustrates the objective of section 8(a)(5) much as does a flat refusal." Notice and opportunity to bargain about proposed changes are essential to the collective bargaining process. If an employer changes wages or other terms without affording the Union an opportunity for adequate consultation, it "minimizes the influence of organized bargaining" and emphasizes to the employees "that there is no necessity for a collective bargaining agent."

For these reasons, during bargaining negotiations, an employer violates section 8(a)(5) of the Act if it unilaterally institutes changes in existing terms or conditions of employment prior to bargaining to impasse. After the parties have bargained to impasse, that is, after good-faith negations have exhausted the prospects of concluding an agreement, an employer does not vio-

late the Act by making unilateral changes that are "reasonably comprehended within his pre-impasse proposals," and are consistent with offers the Union has rejected. Although an employer's power to change working conditions is not contingent upon Union agreement with the proposed changes, notice and opportunity to consult is required before implementing changes in order to give the Union a reasonable opportunity to offer counter arguments and proposals.

44 F.3d 1320, 1325 (6th Cir.1995) (citations omitted).

Here, the ALJ based its finding that Pro-Galv improperly instituted unilateral changes primarily upon the credible testimony of Osborne and Hill. ProGalv contends that the findings were improper because ProGalv's employees legally withdrew from the Union and ProGalv was therefore allowed to implement changes, and because in making the changes it adhered to the basic terms and conditions set forth in the final offer. For example, ProGalv contends that the posting of a seniority list, the proposed retirement plan, and the shortened work weeks in December of 1995, were reasonably related to its previous offer, and ProGalv denies that it ever required mandatory overtime without four hours notice. We disagree with Pro-Galv's contentions.

As noted by the Board, although negotiations between the Union and ProGalv had reached a stalemate or impasse, ProGalv was nevertheless wrong in instituting the unilateral changes because they deviated from the status quo; that is, the terms of the Agreement modified by ProGalv's final offer. For example, the posting of a seniority list that no longer considered time worked at Union Metal was outside the realm of the terms of the Agreement. In addition, the Agreement failed to reference the new retirement plan (401K) instituted by ProGalv on August 14, 1995. Contrary to ProGalv's contentions, the record merely indicates that the Union and ProGalv were discussing the prospect of a retirement plan prior to the Union's decertification. The Agreement itself does not support such a change. Further, ProGalv instituted a partial layoff in December of 1995

without providing the employees an opportunity to bargain. We are not persuaded by ProGalv's attempt to disavow the lay offs by characterizing them as "short weeks" where such a characterization amounts to nothing more than a vain attempt to argue semantics and divert this Court's attention from the reality ProGalv's actions. Finally, despite ProGalv's contention otherwise, testimony from Osborne indicates that it did in fact *require* overtime without the four hour requisite notice as mandated by the Agreement. Therefore, we conclude that the Board's finding that ProGalv improperly instituted unilateral changes in violation of § 8(a)(5) and (1) was supported by substantial evidence.

**III. Violation of Sections 8(a)(1) and (2).**

ProGalv argues the Board's findings that it violated §§ 8(a)(1) and (2) of the Act by fostering and rendering assistance and support to a labor organization known as the In–House Employee Committee ("In–House Committee") were not supported by substantial evidence. We disagree.

The Act provides that it constitutes an "unfair labor practice for an employer … to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C.A. § 158(a)(2) (West 1998). Here, the Board found that ProGalv violated § 8(a)(2) and (1) of the Act by,

> fostering, assisting, and dealing with the In House Employee Committee as demonstrated by Griggs' testimony which I credit in its entirety. I find the evidence presented by the General Counsel fully supports a finding that the In House Employee Committee was a labor organization participated in by the unit employees in a representative capacity and was utilized to deal with the Company [ProGalv] concerning wages, benefits, and other terms and conditions of employment. Here the Company [ProGalv] clearly fostered, assisted, and dealt with the committee and did so on its own terms such as recommending the number of representatives on the committee, who some of them should be and from what shifts they should be drawn. It is clear also that notwithstanding its consid-

eration of employee requests, it set the agenda for the meetings and covered what it chose to. There was some give and take between Respondent [ProGalv] and the committee (i.e., the negotiation with regard to the production bonus). Respondent [ProGalv] held meetings on its premises during paid work time. Such conduct by Respondent [ProGalv] was clearly violative of the Act.

J.A. at 10. In examining whether a company's actions violated § 8(a)(2), two distinct questions must be asked: (1) whether the labor group in question (here the In–House Committee) is a labor organization under the Act; and (2) whether the company dominated or controlled the labor group. *NLRB v. Webcor Packaging, Inc.,* 118 F.3d 1115, 1118–24 (6th Cir.1997). ProGalv argues that it neither formed nor dominated a labor organization, and that the employee committee formed in late July of 1995, was not a labor organization for the purposes of the Act because the In–House Employee Committee did not "deal with" ProGalv concerning work conditions.

***Whether the In–House Employee Committee was a Labor Organization under the Act***

The Act defines "labor organization" as

> any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C.A. § 152(5) (West 1998). "The Supreme Court has long held that this statutory definition is susceptible to a broad interpretation and that the Board should be accorded great latitude in delineating its contours." *Webcor Packaging, Inc.,* 118 F.3d at 1119 (citing *Marine Eng'rs Beneficial Ass'n v. Interlake S.S. Co.,* 370 U.S. 173, 181–82, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962); *NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 211 & n. 7, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959)). The Board has defined the term, "dealing with" to mean:

[A] pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.

\*　　\*　　\*

[I]f the committee exists for the purpose of sharing information with the employer, the committee would not ordinarily be a labor organization. That is, if the committee makes no proposals to the employer, and the employer simply gathers the information and does what it wishes with such information, the element of dealing is missing and the committee would not be a labor organization.

*Webcor Packaging, Inc.*, 118 F.3d at 1119.

█ Here, substantial evidence was presented to support the Board's finding that the In–House Committee was "dealing with" ProGalv within the definition espoused above. For example, the testimony indicated that Kelley knew the In–House Committee had been formed; that the In House Committee met on ProGalv premises and raised various employment issues and proposals they wished to discuss with ProGalv and formed a list of such proposals; that Griggs presented Kelley with the list of these proposals; and that Kelley held a meeting with the In–House Committee to address the proposals. The testimony also indicated that, among the items on the list which were discussed and considered at the meeting, were suggestions for a bonus program based upon work productivity and for a change in job classifications, although ProGalv chose not to institute these proposals. Finally, the testimony indicated that ProGalv had at least three other meetings with the In–House Committee where ProGalv considered other proposals.

Accordingly, under these facts, ProGalv was "dealing with" the In–House Committee by considering these proposals. We are not persuaded by ProGalv's argument that because it did not institute any of the proposals, it was merely sharing information with the In–House Committee, and not "dealing with" it within the definition. As noted above, all that is required to satisfy the definition of "dealing with" is that management respond to the proposal, either by acceptance *or rejection*. Therefore, the fact that ProGalv ultimately decided not to institute the proposals after considering the same, does not take its actions outside the definition of "dealing with." In addition, although ProGalv argues that the Board's finding that ProGalv violated § 8(a)(1) of the Act by forming the In–House Committee as an incentive to decertify the Union is erroneous, ProGalv's argument is misplaced where the Board's Order does not specifically indicate that it's decision was premised upon such a finding.

### Whether ProGalv Dominated the In–House Employee Committee

█ Having found that the In–House Committee was a labor organization, the next relevant inquiry in deciding whether the Board properly concluded that ProGalv violated § 8(a)(2), is whether ProGalv dominated the In–House Committee. *See Webcor*, 118 F.3d at 1123. The Board has defined domination for purposes of satisfying the statute as:

[A] labor organization that is the creation of management, whose structure and function are essentially determined by management, ... and whose continued existence depends on the fiat of management is one whose formation or administration has been dominated under Section 8(a)(2). In such an instance, actual domination has been established by virtue of the employer's specific acts of creating the organization itself and determining its structure and function. However, when the formulation and structure of the organization is determined by employees, domination is not established, even if the employer has the potential ability to influence the structure or effectiveness of the organization.

Thus, ... when the impetus behind the formation of an organization of employees emanates from an employer and the organization has no effective existence independent of the employer's active involvement, a finding of domination is appropriate if the purpose of the organization is to deal with the employer concerning conditions of employment.

*Id.* at 1123–24 (quoting *Electromation, Inc.,* 309 N.L.R.B. 990, 995–96, 1992 WL 386692 (1992) *enforced* 35 F.3d 1148 (7th Cir.1994)).

In *Modern Plastics Corp. v. NLRB,* 379 F.2d 201, 203 (6th Cir.1967), this Court noted that "[t]here is a line between cooperation and domination, and the purpose of the Act is to encourage cooperation and discourage domination." Because the instances of unfair labor practice in *Modern Plastics* showed no more that the company's cooperation with the committee, to the committee's satisfaction and for the benefit of the employees, the Board's Order had to be set aside. *Id.* at 204–05. Here, although there is conflicting testimony, there is testimony nonetheless to indicate that ProGalv's role was one of domination, rather than mere cooperation.

For example, testimony from Kelley indicates that the idea for the formation of an employee committee came from Jim Gates (maintenance man at ProGalv) and Griggs; and that Kelley did not suggest who should be on the committee, how many members the committee should consist of, nor what the committee's bylaws or rules should entail. In addition, Kelley testified that he played no role in the election of the members, and was told after the employees had a meeting who had been chosen to sit on the committee. Griggs testified that no members of management were present at the election of the committee members; that the employees took nominations from those employees present at the election meeting; and that after the election meeting was held, he informed Kelley of the elected members' identities. However, testimony from Griggs also indicates that Kelley told him the *number* of members that should be chosen, *how* they should be chosen, as well as how the committee should function. Because the ALJ found Griggs' testimony credible in its entirety, this

Court should not disturb such a credibility determination and we therefore find that substantial evidence was presented to support the Board's order. *See Turnbull Cone Baking Co.,* 778 F.2d at 295.

## IV. The Bargaining Order as an Appropriate Remedy

ProGalv argues that even if the Board's finding that it violated § 8(a)(5) and (1) was correct, the bargaining order is not warranted. ProGalv also challenges the validity of the Board's remedial order because it directs ProGalv to make employees whole for any loss in wages and benefits due to its unlawful withdrawal of recognition, refusal to bargain, and unilateral changes in working conditions. We disagree.

"Although we review the Board's order for an abuse of discretion, *see* [*NLRB v.*] *Kentucky May Coal Co., Inc.,* 89 F.3d [1235,] 1243 [ (6th Cir.1996) ], we nevertheless apply close scrutiny to that decision." *NLRB v. Taylor Mach. Prods., Inc.,* 136 F.3d 507, 519 (6th Cir.1998). As this Court has found:

> It is for the Board and not the courts ... to make [the determination of what remedy is appropriate] based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of ... the Act the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.... "[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."

*Indiana Cal–Pro, Inc.,* 863 F.2d at 1300 (quoting *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)). This Court has held that a bargaining order is proper as a remedy for § 8(a)(1) violations where essentially three conditions occur:

> 1. The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair

practices on its part and has requested bargaining;

2. The employer has dissipated significantly the Union's majority by the commission of section 8(a)(1) violations; and

3. A fair election cannot be had under all the circumstances of the particular case.

863 F.2d at 1300 (quoting *Priced–Less Discount Foods, Inc.*, 405 F.2d 67, 69–70 (6th Cir.1968)). In fashioning a remedy, the Board should take into account the extensiveness of the employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. *Id.* at 1301. If the Board determines that the possibility of erasing the past practices and of ensuring a fair election by the use of traditional remedies is slight, then a bargaining order should issue. *Id.* (quoting *Gissel Packing Co.*, 395 U.S. at 614–15, 89 S.Ct. 1918).

In the instant case, a bargaining order was the proper remedy where the Board found several violations of § 8(a)(1) and, as such, the likelihood of ensuring a fair election was slight. *See e.g., Indiana Cal-Pro, Inc.*, 863 F.2d at 1301 (finding that past threats of plant closure were particularly persuasive in establishing that a bargaining order was the appropriate remedy). In addition, because the Board supported its reason for the bargaining order by citing to the violations made by ProGalv, which were supported by testimony and facts, the Board's remedy should not be disturbed. *See GES, Inc. v. NLRB*, 697 F.2d 157, 159 (6th Cir. 1983).

Furthermore, the Board properly ordered ProGalv to make its employees whole for any lost wages and benefits due to its unlawful withdrawal of recognition of the Union. This Court has stated that deference should be given to the Board's remedial orders, and that " '[b]ackpay can be an appropriate remedy for a § 8(a)(5) violation ... [and] is a proper remedy where it serves to make whole employees for losses suffered due to an employer's failure to bargain, and also where it creates an incentive for an employer to bargain in good faith with the union representing the employees.' " *Adair*, 912 F.2d at 865 (quoting *NLRB v. Master Slack and/or Master Trousers Corp.*, 773 F.2d 77, 83 (6th Cir.1985)).

Accordingly, in the instant case, where it has been found by substantial evidence that ProGalv violated § 8(a)(5) and failed to bargain, the Board's remedial order should be enforced. Given the totality of the circumstances and the degree of deference that should be afforded to the Board's discretionary decisions regarding appropriate remedies, the order should not be disturbed.

## CONCLUSION

For the above stated reasons, ProGalv's petition for review is **DENIED** and the Board's order is **ENFORCED**.

WELLFORD, Circuit Judge, concurring in part and dissenting in part. For the foregoing reasons, I dissent from the majority opinion in most respects, but I concur to the extent indicated.

**Withdrawal of Recognition**

The preeminent dispute in this case concerned the circumstances of the withdrawal of union recognition by ProGalv. I find the following facts to be clear in this regard:

1. Griggs, the leadman, frequently criticized the union and asked his supervisor, Kelley, how to get rid of the union. Griggs initiated these discussions.

2. A union strike was unsuccessful, but ProGalv took no adverse action against the union members.

3. Kelley told Griggs and other employees that to get rid of the union essentially they would have to do it themselves.

4. Kelley helped Griggs and other employees by obtaining an NLRB phone number so that the employees could seek advice directly from the Board.

5. Kelley helped Griggs and another employee, Wallen, with their petition seeking decertification, by suggesting the proper wording and by telling them that they needed at least 18 signatures before the company could consider withdrawing recognition.

6. Kelley did not have any other contact with, nor did he attempt to persuade, any of the other employees (a majority) who signed the petition.

7. Kelley did not make any promises of benefits, nor did he have any extensive conversations with the employees about forming a separate in-house committee before the petition was signed.

8. Kelley suggested that the employees contact and discuss their wish to withdraw and possible union fines by a majority of employees with an NLRB attorney.

9. Kelley left ProGalv in August of 1995.

I disagree with the majority's conclusion "that ProGalv's conduct fell within the impermissible activity described in *NLRB v. Allen's IGA Foodliner,* 651 F.2d 438 (6th Cir. 1981), as opposed to the permissible conduct described in *Landmark Int'l Trucks, Inc. v. NLRB,* 699 F.2d 815 (6th Cir.1983)." Even if *Allen's IGA* did sustain the Board's finding of an unfair labor practice in an employer's efforts to rid itself of a union which was seeking to organize the grocery store, the circumstances involved in *Allen's IGA* were materially different from the facts in this case. The employer summoned an employee to his office for an explanation as to why that employee did not sign a union withdrawal certificate and directed her to sign it; the employer also fired pro-union adherents and made a contemporaneous announcement of benefits dependent upon the union's ouster. I cannot agree that ProGalv's activity was comparable to the employer's conduct in *Allen's IGA.*

The ProGalv activity in question, even accepting some questionable rationale of the ALJ, simply "brought" to the attention of its employees their right to resign from a union without the communicative use (as in *Allen's IGA*) of "any threat or coercion." *Landmark,* 699 F.2d at 820. See *Adair Standish Corp. v. NLRB,* 912 F.2d 854, 860 (6th Cir. 1990), using this same test.

The proper test as to whether an employer has impermissibly coerced or threatened its employees, or interfered with their right of free chance to join, and/or to withdraw from, a union is whether the employer did more than render "ministerial aid" in assisting employees who wish to disconnect with the union. *Vic Koenig Chevrolet v. NLRB,* 126 F.3d 947 (7th Cir.1997). I think it clear that ProGalv did no more than render "ministerial aid."

Focusing on the background of the petition to withdraw, I must emphasize my disagreement with the majority's inference—and perhaps even with its finding—that Kelley was somehow connected with Griggs' finding of the blank petition in an envelope marked "NLRB" in his truck as he was leaving work. Kelley denied any connection with Griggs' blank petition, or placing it in his truck. There is *no evidence to the contrary.* Kelley testified, after leaving ProGalv, that he did not give Griggs "any instructions with regard to the petition." The episode, moreover, was not alleged as a violation in the complaint by the ALJ, and should not have been taken into account by the majority inferring it was in some way an unfair labor practice. It had no practical significance. The ALJ expressed no adverse inference against ProGalv in this regard, despite crediting Griggs' testimony over Kelley's.[1]

I do not accept the majority's statement, therefore, that ProGalv instigated this blank withdrawal petition "by leaving it in an envelope in Griggs' truck (if not physically placing the petition there himself, at least by authorizing someone to do so)." There is simply no evidence to support this assumption by the majority. The majority points to no witness testimony to that effect, nor to any ALJ finding to that effect. That episode, however, and ProGalv's supposed part in the drafting and placing of the withdrawal petition is the basic reason expressed by the majority that ProGalv instigated and solicited "the employee drafting and circulation of

---

1. The ALJ acknowledged that Kelley "gave a more neutral picture as to his activities than did Griggs," who was observed to be "uncomfortable" in his testimony. Griggs expressed no belief or inference that Kelley put the blank withdrawal petition in his truck. He said he *did not know* how the petition got into his truck, nor, of course, who put it there.

a petition seeking the decertification" (using the words of the ALJ—conclusion No. 6).

The real question relates to whether the employees' obtaining of a substantial majority of signatures to oust the union, ProGalv interfered with employee free choice or did more than render "ministerial aid." It is significant that there is no substantial evidence that ProGalv engaged in unfair labor practices during the abortive strike. Many employees voluntarily sought to return to work soon after the strike began, including Griggs, who observed: "I can't believe these guys were still out on strike." Kelley assisted Griggs and Wallen in using proper language in a petition to withdraw. At the time ProGalv had not committed any unremedied unfair labor practices. *See Columbia Portland Cement Co. v. NLRB*, 979 F.2d 460, 464 (6th Cir.1992). Doing what the employer did in this case is not an unfair labor practice. *Landmark*, 699 F.2d at 820.

The ALJ acknowledged that when the employees returning to work expressed concerns about being fined by the union, Kelley "told them the Company could not do anything and the employees would have to do something about it." ProGalv merely directed the employees to the NLRB itself to present their concerns. Kelley also "told Griggs it [the petition for union withdrawal] would have to be in writing and be signed by the employees and convey their wishes."

I conclude that there was no coercion involved by ProGalv under these facts and that ProGalv gave only "ministerial aid" to the employees who expressed their collective wishes to withdraw. ProGalv did not violate Section 8(a)(1) of the Act nor Section 7 rights of unit employees in this regard. I dissent as to this aspect of the case.

## Good Faith Doubt of Union's Majority Representation

Kelley did not discuss the employees' expressed interest in forming another committee or employee group to discuss their con-

cerns with management until after a majority of employees, in writing, petitioned for withdrawal of the union. The employer must show " 'a good faith reasonable doubt' about the union's majority support." *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 118 S.Ct. 818, 820, 139 L.Ed.2d 797 (1998). The court emphasized in *Allentown Sales*, the goal of the NLRA "of protecting employee choice." *Id.* 118 S.Ct. at 831. It criticized the Board's restrictive steps to preclude an employer's demonstration of a "good faith doubt." [2]

During the period in question, employees evidenced their dissatisfaction with the union. These complaints were not solicited by ProGalv but were initiated by Griggs and others. Striking employees returned to work on their own volition despite fear of fines by the union.[3] Employees approached management about forming a committee instead of the union to represent them. Griggs told Kelley, for instance, "this operation would go a lot better if we didn't have the union." Griggs testified that he and Wallen had obtained more than eighteen employees "as they crossed over" for decertification out of the bargaining unit of 26. Wallen was not called by the Board to testify to support Griggs' testimony nor to gainsay what the ALJ characterized as neutral testimony of Kelley.

Viewing all of the evidence on this question, in the absence of intimidation or threats with respect to the employees' signing of the decertification petition, contrary to the majority and the Board, I conclude that ProGalv clearly acted in good faith in its position that the union no longer represented a majority of its workers. There was no violation of Section 8(a)(5) and (1) in this respect. I dissent accordingly.

## The Committee

Although I believe this issue is a close one, I will concur with the majority that ProGalv violated Section 8(a)(2) and (1) of the Act by assisting and dealing with the "In House Employee Committee." I would yet emphasize that this occurred *after* the decertifica-

---

**2.** "Under *Gissel's* [*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918], employer solicitation of employees' views is protected speech, although such solicitation can constitutionally be prohibited where it amounts to coercion or

threats of reprisal." *Allentown Mack*, 118 S.Ct. at 832.

**3.** Fifteen employees crossed the picket line during the first week or ten days of the strike.

tion petitions were signed, and the employees, without question, initiated this action and chose their own representatives to this committee. The committee, in any event, is no longer functioning.

### Threats After Decertification Petition

I would also concur with the majority that there was substantial evidence, despite serious controversy in this matter, that ProGalv made unlawful threats about plant closure and lost benefits. Here, as the ALJ did throughout his opinion, credibility determinations were made uniformly and consistently against ProGalv. I must confess that I do not understand this posture in light of the record, but there were numerous other circumstances pointing in the other direction as in the case of the circulation of the decertification petition and the good faith belief that a great majority of the workers no longer wanted representation by this union.

### Bargaining Order

Even if the majority were correct in their view that there were several unfair labor practices violations in this case, I must dissent from affirming a bargaining order rather than directing a new election in this case. The signing of the petition to decertify the union by a great majority of workers who were obviously unhappy with the union's policies; the absence of threats or coercion during the strike or during the circulation of the petition; and the employees' intention of a plant committee all counsel strongly against a bargaining order. The loss of wages, if any, in this case was minimal.

[A] large bargaining order as a remedy for violation of § 8(a)(1), carrying with it recognition of the Union, is particularly dangerous when it may have the effect of imposing a union on employees contrary to their actual wishes. This danger points up the desirability of having Board supervised elections where they are possible ... [when] a fair election cannot be had under all the circumstances of the particular case.

*NLRB v. Priced–Less Discount Foods,* 405 F.2d 67, 69–70 (6th Cir.1968).

There is no reasoned basis, it seems to me, to believe that a fair election to reflect the free choice of the workers might not be held. After all, "the purpose of the Board is to protect the bargaining rights of employees, not the bargaining rights of the union." *NLRB v. Ben Duthler, Inc.,* 395 F.2d 28, 34 (6th Cir.1968). A bargaining order should come about only if there have been extensive coercive, abusive or flagrant acts involved which threaten the chance of holding a fair election. No such showing is made in this case. "The Board's determination [to order bargaining] is not immune from review ... [and] we must look at the circumstances surrounding the issuance of the bargaining order." *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1300 (6th Cir.1988). That case added that such an order is not to be "routinely entered ... In [*NLRB v.*] *Rexair* [646 F.2d 249, 251 (6th Cir.1981) ], we declined to enforce a bargaining order, noting that the Board 'failed to support its conclusion that a bargaining order is the *only satisfactory remedy.*' " *Id.* at 1301 (emphasis added).

Therefore, even if the majority were correct in concluding that there were unfair labor practices after July, 1995, I would hold that a bargaining order is an inappropriate remedy under the circumstances of this case. The employer's actions were neither "flagrant" nor "egregious." *NLRB v. Kentucky May Coal Co., Inc.,* 89 F.3d 1235, 1243 (6th Cir.1996).

### Other

I find no need to discuss the other issues in view of my conclusions above.