*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0170P (6th Cir.)
File Name: 00a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL LABOR RELATIONS BOARD,
  *Petitioner/Cross-Respondent,*

  *v.*

ST. FRANCIS HEALTHCARE CENTRE,
  *Respondent/Cross-Petitioner.*

Nos. 98-6297/6401

On Application for Enforcement and Cross-Petition for Review of an Order of the National Labor Relations Board.
Nos. 8-RC-15410; 8-CA-29739.

Argued: October 26, 1999

Decided and Filed: May 19, 2000

Before: RYAN and COLE, Circuit Judges; WILHOIT, District Judge.

---

  *The Honorable Henry R. Wilhoit, Jr., Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:**  G. Roger King, JONES, DAY, REAVIS & POGUE, Columbus, Ohio, for Respondent.  Robert J. Englehart, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner.  **ON BRIEF:**  G. Roger King, Brian G. Selden, JONES, DAY, REAVIS & POGUE, Columbus, Ohio, for Respondent.  Robert J. Englehart, Frederick C. Havard, John D. Burgoyne, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner.

RYAN, J., delivered the opinion of the court, in which WILHOIT, D. J., joined.  COLE, J. (pp. 35-39), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

RYAN, Circuit Judge.  These consolidated appeals arise out of the efforts of the Health Care and Social Services Union, SEIU, AFL-CIO (Union), to become the certified bargaining representative for certain employees of St. Francis Healthcare Centre.  Following two elections, the National Labor Relations Board certified the Union as the bargaining representative.  The Board now seeks enforcement of the bargaining order it issued following the second election, which the Union won.  St. Francis cross-petitions for review of the Board's decision to set aside the first election, which the Union lost, as well as the Board's refusal to review St. Francis's objections to the second election.

We will deny enforcement of the Board's bargaining order and remand the case to the Board to conduct an evidentiary hearing on St. Francis's objection to the second election.

possible that the Board's determination that the Biddle letter does not constitute a violation of the Act is correct.  *See, e.g., Dayton Hudson*, 79 F.3d 546 (upholding the Board's decision after an earlier remand for an evidentiary hearing in *Dayton Hudson Department Store Co. v. NLRB*, 987 F.2d 359 (6th Cir. 1993)); *Van Dorn Plastic Mach. Co. v. NLRB*, 881 F.2d 302 (6th Cir. 1989) (upholding, on second review, the same result after a remand and evidentiary hearing by the Board); *Van Leer Containers, Inc. v. NLRB*, 943 F.2d 786 (7th Cir. 1991) (same); *NLRB v. Monark Boat Co.*, 800 F.2d 191 (8th Cir. 1986) (same); *Bauer Welding & Metal Fabricators, Inc. v. NLRB*, 758 F.2d 308 (8th Cir. 1985) (same).

In sum, I respectfully concur in the court's decision to uphold the first election and to remand the second election for an evidentiary hearing on St. Francis's objection to the Biddle letter.

Francis has established its success on four of the factors articulated by *Mitchellace*. For example, although the majority states that St. Francis is favored on the question of timing, the timing of the letter and some of the other circumstances of this case are not unlike those in *Dayton Hudson Department Store Co. v. NLRB*, 79 F.3d 546, 551 (6th Cir. 1996), in which the court upheld the Board's determination. In *Dayton Hudson*, a letter with substantial misrepresentations was mailed to employees three days before the election, the writers of the letter were known to be allied with the union, but, unlike here, the union won by a significant margin. See id. at 548, 551. In this case, in addition, St. Francis became aware of the letter one or two days before the election, and although it did not respond, it may have had a sufficient opportunity to do so. *See Mitchellace*, 90 F.3d at 1156 (stating that the employer, who learned of a flyer distributed the day before the election, was able to effectively respond). As to the third factor, although the centrality of the issues in the alleged misrepresentation to the representation campaign may be considered, this factor primarily assesses the extent and "artfulness" of the alleged deception. *Cf. Midland Nat'l Life Ins. Co.*, 263 N.L.R.B. 127, 133 (1982) (prohibiting the use of forged documents); *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343, 348 (6th Cir. 1984). The extent of the misrepresentation in this case is disputed; St. Francis alleges it was significant. Fourth, St. Francis raises a material issue of fact on the source of the letter and whether employees could determine the source. Fifth, whether employees were affected by the alleged misrepresentation is unclear; St. Francis has provided scant evidence that employees were affected by the letter. Finally, the election's closeness militates toward holding an evidentiary hearing.

Mindful that no set of factors governs whether or not an evidentiary hearing is necessary, the material issues raised by St. Francis direct us to remand for an evidentiary hearing at which the Board can resolve these factual questions and determine the appropriate result. After this hearing, it is

## I. Standard of Review

A party who seeks to overturn the results of a representation election bears the burden of demonstrating that the election was conducted unfairly. To meet this burden, "the objecting party must demonstrate that 'unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election.'" *Contech Div., SPX Corp. v. NLRB*, 164 F.3d 297, 305 (6th Cir. 1998) (quoting *NLRB v. Shrader's, Inc.*, 928 F.2d 194, 196 (6th Cir. 1991)), *cert. denied*, 120 S. Ct. 64 (1999). While the Board strives to achieve "laboratory conditions" during representation elections, we have recognized that this can be an elusive goal, and so "elections are not automatically voided whenever they fall short of perfection." *NLRB v. Duriron Co.*, 978 F.2d 254, 256 (6th Cir. 1992).

We review for abuse of discretion the Board's determination whether a representation election has allowed employees to exercise free choice. *Colquest Energy, Inc. v. NLRB*, 965 F.2d 116, 119 (6th Cir. 1992). The Board's findings of fact are conclusive if supported by substantial evidence. Evidence is substantial when it is "'adequate, in a reasonable mind, to uphold the [Board's] decision.'" *DTR Indus., Inc. v. NLRB*, 39 F.3d 106, 110 (6th Cir. 1994) (quoting *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985)). We must consider the record as a whole, including evidence that runs contrary to the Board's findings. *Id.* Deference to the Board's factual findings is particularly appropriate where conflicting testimony requires the Board to make credibility determinations. *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987); *see also V&S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999). The Board's application of law to facts is also reviewed under the substantial evidence standard, and "'the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a

different conclusion had the matter been before it *de novo*.'" *V&S ProGalv*, 168 F.3d at 275 (citation omitted).

## II. The First Election

### A.

St. Francis is an Ohio not-for-profit corporation operating a rehabilitation hospital and skilled nursing facility in Green Springs, Ohio. In July 1996, District 1199 of the Union filed a petition with the Board seeking to represent approximately 150 full- and part-time service and maintenance employees at St. Francis's facility. An election was held on October 3 and 4, 1996; 71 employees voted against the Union, 60 voted for the Union, and there were 10 challenged ballots.

The Union filed objections to the election with the NLRB Regional Director. Following a hearing, a hearing officer recommended that the election be set aside and a new election be conducted, based upon three of the Union's objections. Specifically, the hearing officer found that St. Francis had: (1) threatened that unionization would prevent St. Francis from affiliating with a partner, forcing the facility to close within 18 months; (2) threatened to reduce or eliminate current employee benefits during the bargaining process; and (3) prohibited employees from wearing pro-Union insignia on their uniforms and enforced its no-solicitation policy in a discriminatory manner. St. Francis appealed this decision to the Board, which adopted the hearing officer's findings and recommendations and ordered a new election.

We proceed to address the Board's three grounds for ordering a second election.

### II.

I also write separately on our decision to remand to the Board for an evidentiary hearing on St. Francis's objection to the Biddle letter.

Although St. Francis bears the burden in its quest to overturn the election, *see NLRB v. Gormac Custom Mfg., Inc.*, 190 F.3d 742, 746 (6th Cir. 1999), we must take the evidence presented by St. Francis in the light most favorable to the company, *see NLRB v. Valley Bakery, Inc.*, 1 F.3d 769, 772 (9th Cir. 1993); *Prestolite Wire Div. v. NLRB*, 592 F.2d 302, 306-307 (6th Cir. 1979). Here, St. Francis makes a showing of "substantial and material factual issues" which, if proven, would warrant setting aside the election. *See* 29 C.F.R. 102.69(d) (stating that a "hearing shall be conducted with respect to those objections or challenges which the regional director concludes raise substantial and material factual issues"); *NLRB v. Tennessee Packers, Frosty Morn Div.*, 379 F.2d 172, 177-78 (6th Cir. 1967).

As stated by the majority, in addition to the timing of the statement, "this court has considered other factors, including whether the employer was aware of the communication and had an opportunity to respond, the extent of the misrepresentation, whether the source of the misrepresentation was identified, and whether there is evidence that employees actually were affected by the misrepresentation." *Mitchellace v. NLRB*, 90 F.3d 1150, 1155 (6th Cir. 1996). We also note the closeness of the election. *See Gormac Custom Mfg.*, 190 F.3d at 747; *see also Valley Bakery*, 1 F.3d at 773 ("The need for a hearing is particularly great when the election is close."); *NLRB v. Bristol Spring Mfg. Co.*, 579 F.2d 704, 707 (2d Cir. 1978).

The majority finds that St. Francis raises material issues of fact on at least four of these five points. While I agree that St. Francis raises sufficient issues of material fact to support holding an evidentiary hearing, I do not believe that St.

testified that Storer stated, for example, that they would "have to start from zero and work up to regain the benefits" they had. These statements do not merely indicate that, as the majority states, the employees "would need to negotiate to achieve their current benefits once bargaining began," but that St. Francis would begin from zero if the workers unionized. *See NLRB v. Construction & Gen. Laborers' Union, Local No. 534*, 778 F.2d 284, 291 (6th Cir. 1985) (noting that "the speaker's intent must be inferred from the circumstances as they appear to the reasonable person," and that "assertions that the employer will 'bargain from scratch' are unfair labor practices"). Second, the unsigned pro-management leaflet, which stated that the company would begin bargaining at "*0*", provides additional evidence supporting the Board's conclusion that the company violated Section 8(a)(1) of the Act. Further, St. Francis's oral and written statements were made in the context of a campaign in which other violations of the Act occurred, including the hallmark violation of threatened plant closure.

We may not reverse the Board's reasonable inferences "even though [we] might justifiably have reached a different conclusion had the matter been before [us] de novo." *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 313 (6th Cir. 1987). In light of the above evidence presented to the ALJ, I believe that substantial evidence exists to support the Board's determination. This evidence is such that "'a reasonable mind might accept as adequate to support'" the Board's conclusion. *Contech Div., SPX Corp. v. NLRB*, 164 F.3d 297, 305 (6th Cir. 1998), *cert. denied*, 120 S.Ct. 64 (1999) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Because we find independent violations of the Act, the majority's determination of this issue does not require overturning the Board's decision on the first election. Accordingly, I concur in the majority's resolution of the challenge to the first election.

## B.

## St. Francis's Statements Concerning Facility's Long-Term Viability

### 1.

St. Francis's management decided in 1995 to seek potential partners in the health care industry in order to compete more effectively. The company conducted monthly "open forum" meetings at which senior management shared, with all employees who chose to attend, strategic information about the company and its financial situation and explored the possibility of affiliation. At a September 18, 1996, open forum conducted during the Union's organizing campaign, an employee asked St. Francis's CEO, Gregory Storer, whether a vote for Union representation would affect the ability to find a partner. Storer testified before the hearing officer that he responded by explaining that the most likely partner did not have any organized labor contracts and had expressed "concerns" about labor organization at St. Francis. According to Storer, he told employees that the potential partner "wanted to know how it was going and the progress and when the vote was going to take place." Another employee attending the open forum then asked Storer how long St. Francis could survive without a partner. According to Storer, he responded that the organization's current cash reserves would probably allow it to operate for about 18 months.

Employees recalled Storer's statements during the September 18 open forum somewhat differently, testifying as follows:

1. According to Colleen Kimmet, a nurse, Storer stated that St. Francis needed to affiliate with another institution, and that "no hospital or institution would want to affiliate with St. Francis if it was unionized, and without affiliation St. Francis would close in a year and a half."

2.   Karen Slagle, a housekeeper, testified that "[Storer] said that if the union got in that other hospitals would not want to affiliate with us and that financially our doors would close in a year and a half." Slagle then responded to a question from the Union representative:

> **Q:** . . . And so [Storer] told people that hospitals wouldn't take you if you voted for the union, is that what you–
>
> **A:** It wouldn't be attractive to other hospital groups.

3.   Melanie Ott, a nurse's assistant, recalled that Storer stated that "if the union got in that nobody would be affiliated with us because they wouldn't work with a unionized facility. And if it got through that the doors would close within a year, year and a half, because we couldn't stand alone."

4.   According to Naomi Rose, a patient care technician, Storer stated "that the alliance would not join with us if we was union, and that if we became union St. Francis would have to close in a year and a half, because nobody would affiliate with us." On cross-examination, the following colloquy took place:

> **Q:** . . . [Y]ou understood that his remarks were based upon the inability of the hospital to affiliate in the event the union were voted in?
>
> **A:** Yes, sir.
>
> **Q:** . . . And he expressed his belief that the facility would not be an attractive candidate for affiliation if the union were voted in?
>
> **A:** Yes, sir.

———————————

**CONCURRENCE**

———————————

R. GUY COLE, JR., Circuit Judge, concurring. I respectfully write separately to address two points.

I.

First, although I agree with the majority's conclusion that the Board's decision to set aside the first election was supported by substantial evidence, I disagree with the majority's rejection, in Part II.C., of the Board's determination that St. Francis threatened to bargain "from scratch," thereby violating Section 8(a)(1) of the Act.

I agree with the majority that the record contains evidence to support St. Francis's position that its statements were intended to inform employees about the bargaining consequences of union representation. For example, the two memorandum issued by St. Francis present a relatively balanced and permissible presentation of the impact of unionization.

However, the record also contains evidence that St. Francis made impermissible threats regarding bargaining with the union.

> It is well established that "bargaining from ground zero" or "bargaining from scratch" statements by employer representatives violate Section 8(a)(1) of the Act if, in context, they reasonably could be understood by employees as a threat of loss of existing benefits and leave employees with the impression that what they may ultimately receive depends upon what the union can induce the employer to restore.

*Taylor-Dunn Mfg. Co.*, 252 N.L.R.B. 799, 800 (1980). The ALJ heard testimony from employees at the open forum who

enforcement of its bargaining order.  We **REMAND** to the Board to conduct a *Van Dorn* hearing on St. Francis's Biddle letter objection to the second election.

> **Q:**  And for that reason, without affiliation, . . . the facility would close?
>
> **A:**  Yes, sir.

Pro-management literature also addressed affiliation.  For example, Sue Fretz, an RN manager who supervised approximately 80 employees, admitted that she obtained from management a "doctored" Union leaflet which stated, in part:

> HOW WILL THE UNION HELP US WHEN THE FACILITY CLOSES IT'S [SIC] DOORS BECAUSE THE UNION KEEPS US OUT OF LARGER HEALTHCARE SYSTEMS AND THE FINANCIAL SUPPORT THAT COMES FROM THESE AFFILIATIONS????
> EVERYONE WILL BE LOOKING FOR JOBS!!!!!

Fretz circulated this leaflet to her subordinates at meetings, highlighting the language concerning affiliation and warning that unionization could jeopardize the facility's affiliation prospects.

The hearing officer credited the employees' testimony over Storer's testimony and concluded that Storer's predictions about the impact of unionization on affiliation were exaggerated.  Taken in conjunction with the prediction that the facility would close within 18 months without a partner, the hearing officer found that Storer effectively threatened to close the facility in violation of *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).  The Board adopted the hearing officer's findings and ordered a new election based, in part, on these findings.

### 2.

St. Francis contends that the record does not support a threat.  It maintains that Storer merely represented that unionization had the potential to disrupt affiliation, and that

this prediction was supported with objective evidence, specifically, the "concerns" raised by one potential affiliate.

Section 8(a)(1) of the National Labor Relations Act (NLRA) prohibits interference, restraint, or coercion of employees in the exercise of the right to self-organization. 29 U.S.C. § 158(a)(1).

> "The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights. In making this determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees."

*United Parcel Serv. v. NLRB*, 41 F.3d 1068, 1071-72 (6th Cir. 1994) (citations omitted).

Like the Board, we must consider the effect of statements made during a union election campaign from the employees' perspective, taking into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1299 (6th Cir. 1988) (internal quotation marks and citations omitted).

Management's expression of views or opinion is permissible if the expression contains "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Thus, the Supreme Court has held that an employer may

> make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his

St. Francis contends that the six-month statute of limitations period under 29 U.S.C. § 160(b) began to run with its July 1997 refusal to bargain and did not start anew with its March 1998 refusal. The Board maintains that the March 3, 1998, refusal constituted an independent unfair labor practice, and the unfair labor practice charge was filed within six months of that refusal. The Board reasons that the March 1998 refusal was independent of the earlier refusal because it fell within one year of the Union certification, during which time St. Francis was under a continuing obligation to bargain. *See Brooks v. NLRB*, 348 U.S. 96, 104 (1954).

We reject St. Francis's argument. First, we note that the six-month limitations period is procedural, not jurisdictional, and is therefore "subject to recognized equitable doctrines." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 395 n.11 (1982); *see also NLRB v. Babcock & Wilcox Co.*, 697 F.2d 724, 727 (6th Cir. 1983). In *NLRB v. Basic Wire Products, Inc.*, 516 F.2d 261, 268 (6th Cir. 1975), we held that successive refusals to bargain within one year of union certification constitute independent unfair labor practices for purposes of applying the six-month limitations period. *See also Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1264 n.2 (D.C. Cir. 1991). Moreover, even if we were inclined to revisit our holding in *Basic Wire Products*, we need not address the timeliness of the unfair labor practice charge given our other holdings. The Board erroneously denied St. Francis's request for review of the second election on June 16, 1997—almost one month before the Union's first bargaining request. This renders moot the timeliness of the unfair labor practice charge emanating from St. Francis's refusal to bargain.

### V.

We **DENY** St. Francis's petition for review on the first election, **GRANT** St. Francis's petition for review on the second election, and **DENY** the Board's application for

The Board argues as a last resort that St. Francis cannot challenge the failure to conduct an evidentiary hearing on the Biddle letter objection because St. Francis never asked the Board for an evidentiary hearing. This argument is both factually and legally incorrect. In asking the Board to review the Regional Director's certification of the second election, St. Francis addressed the Biddle letter, among other objections. At the conclusion of its request, St. Francis asked the Board to either order a rerun election or "hold a hearing and further develop the evidence in this matter." Moreover, the Board was required to hold a hearing once St. Francis succeeded in raising substantial and material factual issues surrounding the Biddle letter. "'[I]n the course of determining whether the Board has abused the discretion entrusted to it by Congress to adjudicate representation disputes fairly, we must satisfy ourselves that the Board's order is the product of procedures which are fundamentally fair.'" *Gormac*, 190 F.3d at 746 (quoting *Shrader's*, 928 F.2d at 198).

We conclude, therefore, that the Board abused its discretion in refusing to grant an evidentiary hearing to evaluate the Biddle letter under *Van Dorn* and its progeny.

## IV. Statute of Limitations

Finally, St. Francis maintains that the Board, and therefore this court, lacked jurisdiction over the Union's unfair labor practice charge because the charge was untimely. On July 14, 1997, following the Regional Director's certification of the second election, the Union sent a letter to St. Francis requesting dates for collective bargaining. In its July 28, 1997, response letter, St. Francis refused to bargain and advised the Union that it intended to seek judicial review of the certification. On February 20, 1998, the Union again requested bargaining. In a March 3, 1998, response letter, St. Francis directed the Union to its earlier refusal. The Union filed its unfair labor practice charge with the NLRB on March 11, 1998.

control . . . . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion [and in violation of the NLRA].

*Gissel Packing Co.*, 395 U.S. at 618 (citations omitted); *see also Indiana Cal-Pro*, 863 F.2d at 1298. If an employer succeeds in articulating an objective basis for its prediction, the Board bears the burden of demonstrating that the prediction was not objective or was untruthful. *DTR Indus.*, 39 F.3d at 114.

Although the matter is not entirely free from doubt, we conclude that we must agree with the Board's determination that Storer threatened facility closure in violation of section 8(a)(1). This threat was comprised of two predictions: (1) that no entity would affiliate with St. Francis if the Union won the election; and (2) that St. Francis could not operate longer than 18 months if it failed to affiliate with a partner. The parties do not dispute the content or objective basis for the second prediction.

Rather, the dispute centers on the first prediction and, specifically, what Storer said and his objective basis for such statement. We defer to the Board's finding that Storer predicted that *no* partner would want to affiliate with St. Francis if the facility elected the Union. We see no reason to disturb this credibility determination, which the hearing officer based upon the cumulative testimony of employee witnesses and his observations of witness demeanor. St. Francis has failed to articulate an objective basis for this prediction. St. Francis insists that the most likely partner had expressed "concerns" about possible unionization at St. Francis. However, this evidence hardly supports the prediction that *no* company would want to affiliate with St. Francis if the employees elected a union. Viewing Storer's

statements from the perspective of employees, his exaggeration of the objective evidence was material. Thus, substantial evidence supports the Board's finding that Storer's exaggerated prediction violated section 8(a)(1)'s prohibition on coercing employees in the exercise of their organization rights.

St. Francis argues, in the alternative, that Storer's statements occurred too far before the election to interfere with employees' free and fair choice. Timing is one of the objective factors that the Board considers in determining whether forbidden statements were reasonably likely to interfere with employees' free choice. *See NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 286 (6th Cir. 1998). However, it is not dispositive. Thus, in *Peabody Coal Co. v. NLRB*, 725 F.2d 357 (6th Cir. 1984), we upheld the Board's determination that the employer engaged in misconduct during a representation election by making unsupported predictions of plant closure where those predictions occurred three and four weeks before the election. In this case, the threat occurred approximately two weeks before the election. Given that threats of facility closure are among the most flagrant variety of unfair labor practices, *DTR Indus.*, 39 F.3d at 113, and are likely to be difficult to dispel when viewed from the employees' perspective, we see no reason to disturb the Board's finding based on the timing of the threat.

## C.

### St. Francis's Representations Concerning Bargaining Posture

### 1.

During an August 6, 1996, open forum, an employee asked what benefits would be available if the employees voted for Union representation. According to Storer, he responded that bargaining in contract negotiations involves a give and take, that employees may keep something and may lose something, and that "everything is negotiable." He recalled using the

the election decisively. The closeness of the results of the second election, standing alone, may be insufficient to support a finding that the Biddle letter actually affected employees. But we view this evidence in the context of the overall Union election campaign. St. Francis established a material issue of fact as to the impact of the Biddle letter because: (1) the Union lost the first election by an even greater margin than that by which it won the second election; (2) employees did not see the Biddle letter during the first election campaign; and (3) the Biddle letter touched on a significant and contested issue in the campaign.

The Board insists that it was unnecessary to conduct the foregoing analysis in this case because the employees were capable of recognizing the Biddle letter as campaign propaganda and accord it the proper weight. The Board cites *Contech*, 164 F.3d 297, in support of its contention. The Board's approach is clearly at odds with *Van Dorn* and its progeny. First, *Contech* is distinguishable from this case, as the alleged misrepresentations in *Contech* appeared in Union letters and there was no evidence of "pervasive misrepresentation or artful deception." *Id.* at 307. In contrast, the Biddle letter was not readily identifiable as campaign propaganda because it appeared to be a personal message from a former co-worker, was handwritten in letter rather than leaflet form, and used language such as "we" and "fellow co-workers." *See Dayton Hudson*, 987 F.2d at 365. Most importantly, labeling material as "propaganda" does not insulate the material from consideration under *Van Dorn*. Such an approach would effectively eviscerate *Van Dorn* because virtually *any* representation made in the context of a union campaign could be characterized as propaganda. Thus, even if employees are capable of recognizing literature as campaign propaganda—based on its source or content—a misrepresentation in the propaganda may be so artful or deceptive that it overcomes the employees' natural skepticism, "resulting in employees believing that the campaign propaganda must absolutely be true." *Hub Plastics*, 52 F.3d at 613.

The third, and most important, factor favors St. Francis. *See Gormac*, 190 F.3d at 748. First, it is undisputed that the management raise issue was hotly contested in the days leading up to the second election. The Union's campaign literature suggested that management's greed was detrimental to the employees' work environment and to St. Francis's overall patient care mission. The management raise issue was closely related to one of the central issues in both campaigns—St. Francis's long-term financial viability. Second, the Biddle letter insinuates that St. Francis intentionally lied to its employees by denying that it gave raises and engaged in deceptive practices by backdating the raises. Thus, the letter challenges St. Francis's overall credibility, even apart from the management raise issue. *See NLRB v. Hub Plastics, Inc.*, 52 F.3d 608, 612 (6th Cir. 1995).

Fourth, we find that St. Francis has established an issue of material fact as to the source of the Biddle letter. There appears to be no dispute, at least at this juncture, that Biddle wrote and signed the letter. However, St. Francis offered evidence that the Union was responsible for mailing the letter to the employees. Contrary to the Board, we do not believe that most employees would assume that the letter was Union-sponsored propaganda simply because it addressed an issue that the Union had raised in earlier campaign literature. Likewise, although the Biddle letter states that the Union had helped Biddle fight for "[her] rights," the letter does not suggest that the Union had any involvement in drafting, sponsoring, or circulating her letter. *Cf. Gormac*, 190 F.3d at 749. No Union insignia appeared on the letter or the envelope, the letter was handwritten, and only Biddle's return address appeared on the envelope.

The fifth factor also weighs in favor of St. Francis, albeit somewhat less strongly than the third or fourth factors. The second election was relatively close, with 68 employees voting for the Union, 61 voting against the Union, and six challenged votes. Even ignoring the challenged ballots, if the Biddle letter affected the vote of four employees, it impacted

words "start[ing] from scratch" in describing the bargaining process. Storer denied stating that employees would lose their benefits before bargaining began, or that minimum wage with no benefits was the starting point for bargaining.

The Union presented testimony from two employees who attended the August 6 open forum. Employee Rose recalled Storer stating that bargaining starts "from zero" and that if employees wanted the level of benefits they currently enjoyed, they would need to negotiate it and it was "not guaranteed that [they would] get them." According to employee Kimmet, Storer stated that everything was up for negotiation, nothing was guaranteed, and employees would start from zero and "negotiate back up" or "work up to regain the benefits."

On August 21, 1996, St. Francis distributed campaign literature to its employees stating, in relevant part:

> While bargaining goes on, wages, benefits and working conditions typically remain as they have been until an agreement has been reached.
>
> . . . .
>
> Collective bargaining is a gamble — with your wages, benefits and working conditions on the table . . . . Collective bargaining means that you could possibly end up with ***more***, the ***same***, or ***less*** than you have now.

(Emphasis in original.)

In a September 4, 1996, memorandum to employees, Storer noted that employees had inquired about the bargaining process following the August 21 memorandum. The September 4 memorandum, in question-and-answer format, included the following description of bargaining:

**QUESTION**: The union said negotiations mean we keep what we have and change what we do not like. Is this true?

**[ANSWER:]** Negotiations are a process of give and take. If you have a union, it would mean you are willing to give them your wages, benefits, and other things you have now. The union will bring these things to the Facility and negotiate. In the end you could end up with more, the same, or less than what you have now.

The union may say you will get more, but there are no guarantees. Again, negotiations involve a process of give and take and YOU COULD LOSE.

St. Francis distributed a similar memorandum on September 24, 1996, stating that employees "must negotiate your wages, benefits, and working conditions through the bargaining process where you could gain, stay the same or lose." Another pro-management leaflet of uncertain origin warned employees not to:

FORGET that everything will start at *"0"* when the contract negotiations begin!! We could be *GIVING UP* what we take for granted . . . ACCUMULATIVE PTO, DRESS DOWN DAYS, ETC. . . . Things could get a lot *WORSE* instead of better!

Based on this evidence, the hearing officer found that Storer had stated that bargaining would start "from zero" and employees would need to "bargain up" to regain the benefits they already had. While some literature used more balanced language, the pro-management leaflet from an unidentified source used the "start at '0'" phrase. The officer held that these oral and written statements constituted an unlawful threat to reduce employee benefits and begin bargaining at zero if the employees voted for Union representation. The Board adopted these findings.

that employees did not actually receive the letter until two days before the election, at most, and perhaps one day. We explicitly disapproved of such conduct in an analogous case where a letter overstating the company's profits was mailed to employees three days before an election. *Dayton Hudson Dep't Store Co. v. NLRB*, 79 F.3d 546, 551 (6th Cir. 1996).

The second factor is St. Francis's opportunity to respond to the alleged misrepresentations. We reject the Board's contention that St. Francis had an adequate opportunity to address the management raise issue because St. Francis circulated a letter to all employees one week before the election. The Biddle letter appeared *after* St. Francis's letter and raised a serious question as to the veracity of St. Francis's earlier representations. Thus, our analysis focuses on St. Francis's opportunity to respond to the Biddle letter, in particular, rather than its opportunity to address the general management raise issue.

We first note that the nature of the alleged misrepresentations, which directly challenged St. Francis's overall credibility, may well have undermined St. Francis's ability to develop an effective response. While St. Francis could have undermined Biddle's credibility by publicizing the true reason for her discharge, it chose not to do so out of concern for Biddle's privacy. St. Francis presented to the Regional Director an affidavit from its Human Resources Director, Joan Schmidt, stating that she learned of the Biddle letter one day before the election. In a separate letter to the Regional Director, St. Francis explained that "Storer and other managers were able to respond to some questions from employees in the day *or two* preceding the election about the statements made in Biddle's letter . . . ." (Emphasis added.) This evidence suggests that St. Francis may have had at least some opportunity to address the Biddle letter before the election. The direction in which this second factor points is, therefore, unclear.

deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.

*Id.* at 133 (footnotes omitted), *quoted in Dayton Hudson Dep't Store Co. v. NLRB*, 987 F.2d 359, 364-65 (6th Cir. 1993). We carved out a narrow exception to *Midland National* in *Van Dorn*, holding:

There may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected. We agree with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made.

736 F.2d at 348.

We apply this standard by assessing a number of factors, including: (1) the timing of the misrepresentation; (2) whether the employer had an opportunity to respond; (3) the nature and extent of the misrepresentation; (4) whether the source of the misrepresentation was identified; and (5) whether there is evidence that employees were affected by the misrepresentation. *Gormac*, 190 F.3d at 747 (citing *Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1155 (6th Cir. 1996)). The closeness of the election is an important consideration in evaluating the fifth factor. *See id.* None of the factors, standing alone, is dispositive.

We are satisfied that St. Francis presented evidence raising, at a minimum, material factual disputes as to at least four of these five factors. If proven, this evidence would justify setting aside the second election. First, the timing of the Biddle letter cuts in favor of St. Francis. St. Francis presented evidence that the Biddle letter was mailed three days before the election directly to the employees' homes, rather than being distributed at the workplace. It is reasonable to infer

## 2.

St. Francis contends that it properly advised employees about the potential consequences of choosing Union representation, asserting that there was no evidence to support the Board's conclusion that Storer threatened to *reduce* benefits. The Board insists that this issue is one of witness credibility, and that the employees' testimony demonstrated St. Francis's intent to adopt a regressive bargaining posture.

It is not unlawful for an employer to adopt a hard bargaining posture in labor negotiations. To the contrary, hard bargaining is "countenanced by the NLRA as an inevitable aspect of labor-management relations." *NLRB v. Gibraltar Indus., Inc.*, 653 F.2d 1091, 1096 (6th Cir. 1981). Thus, an employer may represent during an election campaign that it will adopt a hard bargaining posture if a union is elected. Such a prediction, taken alone, does not interfere with the employees' free and fair choice.

On the other hand, where an employer "convey[s] the message that a consequence of the selection of the union would be the discontinuance of existing benefits and a 'start from scratch,'" such a statement may have a coercive effect that violates the NLRA. *Surprenant Mfg. Co. v. NLRB*, 341 F.2d 756, 761 (6th Cir. 1965). In assessing such a representation, the Board must consider the timing of the statement, the opportunity of the union to respond, and the content of the union's responses. *Automation and Measurement Div., Bendix Corp. v. NLRB*, 400 F.2d 141, 146 (6th Cir. 1968).

The Board's finding that St. Francis threatened to decrease or eliminate existing benefits before bargaining began is not supported by substantial evidence on the record as a whole. First, Storer's admitted statement that negotiations would start "from zero" or "from scratch" was—taken alone—a permissible prediction of a hard bargaining posture. The hearing officer nevertheless couched his conclusion of an

unlawful threat in terms of "credibility," explaining that he found the testimony of Rose and Kimmet more believable than Storer's testimony. We see no reason to disturb this credibility determination. However, the testimony of Rose and Kimmet does not support a finding that Storer threatened to *reduce* or *eliminate* benefits before bargaining began. We recognize that our review of the Board's inferences from the factual evidence "'is limited to the determination of reasonableness—not rightness.'" *NLRB v. Kentucky May Coal Co.*, 89 F.3d 1235, 1242 (6th Cir. 1996) (quoting *NLRB v. Paschall Truck Lines, Inc.*, 469 F.2d 74, 76 (6th Cir.1972)). We find, however, that the Board's inference from the employees' testimony was unreasonable. Rose's and Kimmet's testimony—that employees would need to negotiate to achieve their current benefits once bargaining began—merely explained the permissible bargaining "from zero" statement in more concrete terms.

Even assuming *arguendo* that Storer did threaten during the August 6 open forum that employee benefits would be reduced or eliminated before negotiations began, the timing of this statement and later events remedied any possible coercive effect. The statement was made to a limited number of employees who chose to attend the open forum almost two months before the election, giving the Union ample opportunity to respond. As it happened, no response was necessary because St. Francis's own campaign literature distributed after August 6 obviated any threat to reduce or eliminate benefits before bargaining began. That literature, which was addressed to *all* employees, explicitly stated that employees could expect to remain at their current levels of pay and benefits during negotiations but could ultimately lose or gain benefits as a result of the bargaining process. Contrary to the hearing officer's suggestion, the reference in one piece of literature to bargaining "from zero" was entirely permissible and was not coercive.

Our rejection of the Board's finding that St. Francis threatened to reduce or eliminate benefits does not require us

to conduct a review consistent with our decision in *Van Dorn* and its progeny.

The Board argues that the Regional Director correctly held that *Van Dorn* did not require an evidentiary hearing in this case because the Biddle letter was not forged or deceptive. It is the Board's position that the employees could recognize the Biddle letter as Union propaganda given the letter's content and the fact that the Union had previously publicized the pay raise issue in its campaign.

We review a Board's decision to uphold or set aside an election in light of campaign misrepresentations for abuse of discretion. *Van Dorn*, 736 F.2d at 347. The Board abuses its discretion if it refuses to grant an evidentiary hearing when material issues of fact exist as to whether a fair election was held. However, we will remand a case for an evidentiary hearing only where "an employer's objections and supporting proofs indicate that there exist material, factual disputes with the Regional Director's report which, if proved, demonstrate that the election should be overturned." *Colquest Energy*, 965 F.2d at 119; *see also NLRB v. Gormac Custom Mfg., Inc.*, 190 F.3d 742, 746 (6th Cir. 1999).

We adhere to the standards articulated under *Midland National Life Insurance Co.*, 263 N.L.R.B. 127 (1982), and *Van Dorn*, 736 F.2d 343, in evaluating whether campaign literature unlawfully interfered with the employees' free choice in a representation election. In *Midland National*, the Board adopted the following rule:

> [W]e will no longer probe into the truth or falsity of the parties' campaign statements, and . . . we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the

In objecting to the results of the second election, St. Francis argued to the Regional Director that the Biddle letter included misrepresentations that interfered with the employees' ability to decipher the truth. St. Francis stated that it could offer evidence that: (1) Biddle's claim about the raises was untrue; (2) that the Union owned the postage meter used to mail the Biddle letter to employees; and (3) that Biddle had been discharged for falsifying paid-time-off records. St. Francis argued that Biddle's misrepresentations were severely damaging to the employer's credibility on this key campaign issue given Biddle's former position as a St. Francis human resources secretary, which gave her access to payroll information and thereby bolstered her credibility. The Regional Director, citing our decision in *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343 (6th Cir. 1984), rejected the employer's argument without a hearing, concluding that the letter was

> typical campaign propaganda that surfaces almost invariably in strongly contested union campaigns. I do not believe the fact that Biddle had recently been discharged from a position as a human resources secretary made it impossible for employees to ascertain the value of this particular piece of literature.

### 2.

St. Francis contends that the Biddle letter had a devastating impact on the outcome of the second election because Biddle did not acknowledge that she was writing with the Union's cooperation and because she falsely alleged that management had received a raise within the past year. The Biddle letter "compounded" her falsehood by discrediting any documentary evidence that St. Francis might offer in response, falsely alleging that check amounts were backdated and the difference was given in a separate check. St. Francis insists that the results of the second election should be set aside and a new election ordered. In the alternative, St. Francis argues that the issue should be remanded to the Board

to reverse the Board's decision to set aside the first election, however. That decision properly was based on the totality of circumstances, rather than a single incident. *See Contech*, 164 F.3d at 306. Therefore, we consider all of those circumstances in reviewing the Board's decision.

### D.

### St. Francis's Enforcement of its Uniform Policy

### 1.

St. Francis's established guidelines for employee appearance provided that "[o]ther than name tags and school or service pins, absolutely no other badges or buttons shall be affixed to any employee's uniform or clothing." Two employees testified that their supervisors instructed them to remove a Union button bearing a written message during the campaign. Several employees testified that they were also instructed to remove purple "smiley face" buttons that were known to express Union support but contained no written message. The Union presented evidence that employees regularly wore other types of buttons, such as sports logos and other symbols, which they were not asked to remove. Both Storer and a St. Francis supervisor testified that St. Francis changed its position shortly after employees started wearing the "smiley face" pins to allow Union supporters to wear these pins. St. Francis continued to prohibit the Union pin bearing a written message.

The hearing officer credited the testimony of several employees who stated that they were ordered to remove Union pins from their uniforms and that other types of pins were permitted in the facility. He also found that management had made a conscious decision to permit employees to wear the "smiley face" pin a few days after those pins appeared. The hearing officer concluded that St. Francis's restriction on wearing Union insignia was unlawful because St. Francis failed to demonstrate any special circumstances to justify the restriction. He discounted St.

Francis's decision to permit the smiley face pin as "nothing more than an attempt by the Employer to impress employees with the control it exercises over their right to support a union." The Board adopted these findings.

**2.**

St. Francis argues that it was justified in enforcing its appearance guideline to prohibit employees with patient contact from wearing Union pins on their uniforms. It discounts the evidence that employees were permitted to wear other kinds of pins on their uniforms, arguing that these pins were smaller than the Union pins. Given its decision to permit the purple "smiley face" pins shortly after they appeared, St. Francis contends that its prohibition on pins had a *de minimis* impact, at most. On the other hand, the Board argues that St. Francis failed to demonstrate any special circumstances to justify its prohibition on Union pins. We find that substantial evidence supports the Board's conclusion. We note that this type of misconduct would likely be insufficient, in and of itself, to justify setting aside an election. However, we consider it as part of the totality of circumstances surrounding the first election.

The NLRA protects employees' "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. An employer who interferes with these rights engages in an unfair labor practice. *Id.* § 158(a)(1).

Wearing union buttons and pins falls within the definition of "other concerted activities" under section 157 and, therefore, is protected under the NLRA. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 802-03 (1945). "[W]earing union insignia furthers 'the right [of employees] to communicate effectively with one another regarding self-organization at the jobsite.'" *NLRB v. Autodie Int'l, Inc.*, 169

had received a raise since March 1996 and that Storer had not received a raise since October 1995. Subsequently, a letter purportedly authored by a former employee of St. Francis's human resources department, Shelly Biddle, was mailed to all bargaining unit members at their homes. The letter was postmarked March 17—just three days before the election—and stated as follows:

> . . . I was not an eligible voter but I had access to administrative procedures and I know that administration did not follow their own policies. Workers were unjustly fired, written up, and threatened for managements [sic] own selfish reasons. According to a letter from [St. Francis], no raises were given to management. I can tell you this is not true. Raises were given to certain members of management. Not only did they receive a raise, but the amount was back dated and the difference was given in a separate check. Their inconsistencies not only cost myself and fellow co-workers their jobs, but created intimidation and fear for our co-workers.
>
> Even the federal government has said that management is not credible. If I could vote I would vote YES and I hope and pray that all employees eligible to vote will do the same. You now have a second chance to make changes inside St. Francis. Vote yes . . . to start the process of change.
>
> I'm in full support of all St. Francis employees that are scared, but it's time we all stand up and stick together. If we join together and fight we can win! I am currently fighting for my rights as well as yours and if not for the union I could not do it.
>
> I am keeping you in my prayers.

St. Francis presented evidence that it learned of this letter one day before the election.

### F. Conclusion

In sum, we conclude that substantial evidence supports the Board's determination that St. Francis interfered with the employees' free choice during the first election campaign by threatening to close the facility if the Union were elected, prohibiting employees from wearing certain Union support pins, and enforcing its no-solicitation policy in a discriminatory manner. Therefore, we will not disturb the Board's decision to set aside the first election.

## III.  The Second Election

### A.

The second election was held on March 20 and 21, 1997, more than five months after the first election. Sixty-eight employees voted in favor of the Union, 61 opposed, and there were six challenged ballots. On March 28, 1997, St. Francis filed objections to the second election, and the Regional Director overruled the objections without a hearing. The Regional Director certified the Union as the collective bargaining representative of the designated bargaining unit on April 24, 1997. St. Francis requested NLRB review of the certification, but the NLRB denied the request on June 16, 1997. On appeal, St. Francis raises only one objection to the certification of the second election results.

### B.

### The Board's Failure to Hold a *Van Dorn* Hearing on the Biddle Letter

### 1.

Shortly before the second election, Union literature accused management of awarding the CEO, Storer, a 14% raise, while other employees had received no raises. On March 13, 1997—one week before the second election—St. Francis responded with a letter to employees representing that no one

F.3d 378, 383 (6th Cir. 1999) (quoting *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978)). However, this right is not absolute. *Id.* An employer may restrict employees from wearing union insignia if it can demonstrate special circumstances that require the restriction to maintain production and discipline. *Republic Aviation*, 324 U.S. at 803-04; *Meijer, Inc. v. NLRB*, 130 F.3d 1209, 1214 (6th Cir. 1997).

We have struggled in this circuit in applying *Republic Aviation* to employer policies that generally prohibit employees from wearing buttons or pins on their uniforms. Our approach to this issue is somewhat in flux. While it is unnecessary to definitively resolve this issue given the facts in this case, a summary of the relevant authority is warranted.

In 1984, a divided panel adopted a *per se* rule, holding that "where an employer enforces a policy that its employees may only wear authorized uniforms in a consistent and nondiscriminatory fashion and where those employees have contact with the public, a 'special circumstance' exists as a matter of law which justifies the banning of union buttons." *Burger King Corp. v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984), *disagreement recognized by Meijer*, 130 F.3d 1209.

We applied *Burger King* in *United Parcel Service*, 41 F.3d 1068, where we reviewed the Board's finding that UPS unlawfully disciplined a UPS driver for wearing a union lapel pin on his uniform. UPS maintained uniform and personal appearance standards that required drivers to wear "[o]nly designated uniform items approved by UPS." *Id.* at 1069. The relevant collective bargaining agreement (CBA) authorized UPS to establish "reasonable standards concerning personal grooming and appearance and the wearing of uniforms and accessories." *Id.* We first noted that the rule in *Burger King* was applicable because the UPS uniformed drivers had substantial contact with the public. *Id.* at 1073. Proceeding with the *Burger King* analysis, we concluded that UPS did not enforce its uniform policy in a discriminatory

manner. We noted that UPS had issued "Desert Storm" pins, safe driving pins, United Way pins, and Mack Truck pins, but held that such conduct did not evidence discriminatory enforcement because the CBA did not restrict UPS's right to issue standards for uniforms. *Id.* Thus, we held that the employer did not violate the NLRA. *See also NLRB v. Mead Corp.*, 73 F.3d 74, 79 (6th Cir. 1996) (citing *United Parcel Serv.*, 41 F.3d 1068).

More recently, another divided panel declined to apply the *Burger King per se* rule. In *Meijer*, 130 F.3d 1209, the Board sought to prohibit Meijer from disciplining employees who wore union pins. *Id.* at 1210. The company permitted its uniformed employees to wear only those pins approved by the company, including buttons promoting certain products or services, customer relation program buttons, or buttons designating union affiliation. *Id.* at 1210-11. A new store manager at one location prohibited employees from wearing any pins other than name badges, company approved buttons, United Way pins, or service recognition pins during a union organizing campaign. *Id.* at 1211. The manager enforced his policy and disciplined employees who wore "Union Yes" pins during the election campaign. *Id.*

Meijer argued that the discipline was appropriate under *Burger King*. *Id.* at 1214. The *Meijer* majority expressed skepticism of the *per se* rule in *Burger King*. The majority observed that the *Burger King* panel did not attempt to reconcile its holding with the *Republic Aviation* requirement that employers demonstrate special circumstances to justify restricting employees' presumptive right to wear union insignia. *Id.* at 1215. The *Meijer* court distinguished *United Parcel Service*, reasoning that the court based its holding in that case on UPS's right under the CBA to promulgate appearance standards. *Id.* The *Meijer* majority ultimately rejected *Burger King*'s *per se* rule in favor of the following:

[The right to wear union insignia] can be curtailed if an employer makes an affirmative showing that a special

It appears that St. Francis's written policy prohibits distribution of literature at any time in areas *beyond* immediate patient areas, such as the dining room and other "work area[s]." More importantly, based on Storer's testimony, St. Francis adopted a policy during the Union campaign that was broader than its written policy, prohibiting the posting of literature *anywhere in the facility*. St. Francis has offered no evidence that these broad prohibitions were necessary to protect patient care or the hospital's operations, as required under *Beth Israel Hospital/Baptist Hospital*. Nevertheless, the hearing officer assumed that St. Francis's no-solicitation policy was valid, and the Board has not argued to the contrary.

Rather, the Board contends that St. Francis applied a valid no-solicitation policy in a discriminatory manner. An employer that adopts a valid no-solicitation policy may violate the NLRA by discriminating against union solicitation in enforcing the policy. *See Meijer*, 130 F.3d at 1212-14; *NLRB v. St. Vincent's Hosp.*, 729 F.2d 730, 735 (11th Cir. 1984); *Reno Hilton Resorts*, 320 N.L.R.B. 197, 208 (1995). Here, there was ample evidence in the record to support the Board's conclusion that anti-Union literature was posted throughout the facility in violation of Storer's prohibition. St. Francis's argument that the posting of anti-Union literature complied with the terms of its written no-solicitation policy is misplaced. The posting clearly violated Storer's expansion of that policy during the Union campaign. Moreover, that Storer directed managers to remove anti-Union literature once he learned of its existence is insufficient to undermine the evidence that such literature was pervasive and at least one manager was seen walking by the literature without removing it. In short, substantial evidence supports the Board's determination that St. Francis tolerated the posting of anti-Union literature in violation of its stated no-solicitation policy and thereby unlawfully discriminated in enforcing its policy.

know who was responsible for the postings and did everything in its power to remove the anti-Union literature. The Board argues that there was no noticeable effort to remove the literature, that St. Francis tolerated other types of solicitation, and that any effort that St. Francis may have made to remove the literature was ineffective.

"Employer rules prohibiting organizational solicitation are not in and of themselves violative of the [NLRA] . . . ." *NLRB v. United Steelworkers of Am., CIO*, 357 U.S. 357, 361 (1958). As a general matter, an employer may adopt a rule prohibiting employee solicitation during working hours. An employer may also prohibit employee solicitation on company property after working hours if the employer demonstrates that the rule is necessary to maintain production and discipline; absent such a showing, the solicitation rule is invalid even if it is enforced neutrally against all solicitors. *See Republic Aviation*, 324 U.S. at 803 & n.10, 805.

Patient care concerns partially trump this general rule in the nonprofit hospital setting. A hospital may ban *all* solicitation and distribution in immediate patient care areas such as patient rooms, operating rooms, and other locations where patients receive treatment. *Beth Israel Hosp.*, 437 U.S. at 495. However, to restrict employee solicitation in non-work areas or distribution of union literature during non-work times in non-work areas such as lounges and cafeterias, the hospital must demonstrate that such solicitation would disrupt patient care or health care operations. *Id.* at 495, 507; *NLRB v. Harper-Grace Hosps., Inc.*, 737 F.2d 576, 578 (6th Cir. 1984). Thus, if a hospital's no-solicitation policy applies to areas beyond immediate patient care areas, the hospital bears the burden of presenting affirmative evidence to justify the policy in such areas. *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 784-86 (1979). "If the record is somehow incomplete on this point, it is the hospital's fault for not producing sufficient evidence." *Harper-Grace Hosps.*, 737 F.2d at 579.

circumstance exists which requires restrictions of this right in order to maintain production, reduce employee dissension or distractions from work, or maintain employee safety and discipline. This right may also be curtailed if the employer makes an affirmative showing that the union insignia that the employee seeks to wear will negatively impact a certain public image that the employer seeks to project.

*Id.* at 1217. The court enforced the Board's order because Meijer failed to satisfy this burden. *Id.*

However, we recently suggested an arguably more relaxed standard than that articulated in *Meijer*. In *Autodie*, 169 F.3d 378, the NLRB sought to prohibit the employer from requiring employees to remove union steward pins. The employer had not implemented a general dress code or uniform requirement and permitted employees to wear informal clothing bearing product and business advertisements and logos from other companies. *Id.* at 384. Citing the employer's burden to demonstrate "special circumstances" to justify its restriction, we noted that this burden "is particularly difficult to meet when the employer cannot show that its restrictions . . . comport with an announced policy of general applicability." *Id.* In enforcing the Board's order, we noted that the employer failed to demonstrate "either 'special circumstances' requiring the restriction to maintain production and discipline or an announced policy of general applicability justifying its restrictions of protected . . . activity." *Id.* Thus, we suggested that a general uniform policy may justify independently a restriction on union pins. We did not address the possible inconsistency between this approach and the *Meijer* approach.

Nevertheless, it is unnecessary for us to resolve any possible discrepancy between *Meijer* and *Autodie* because neither approach supports St. Francis's position. There is no dispute that St. Francis consistently prohibited Union pins bearing a written message, as distinguished from the "smiley

face" pins that it decided to allow. St. Francis has not articulated, much less demonstrated, any special circumstance to justify this restriction under *Meijer*. There is no evidence that the restriction was necessary to maintain production, reduce employee dissension, or maintain employee safety or discipline. Likewise, despite the existence of a uniform policy, St. Francis has not made an affirmative showing that the Union pins would harm St. Francis's public image. Finally, St. Francis is unable to satisfy even the more relaxed *Autodie* standard because it did not consistently enforce its uniform policy. To the contrary, substantial evidence supports the Board's finding that St. Francis regularly tolerated non-Union pins and buttons on employee uniforms although those pins violated St. Francis's uniform policy. Unlike the employer in *United Parcel Service*, St. Francis had not reserved its discretion to authorize certain pins on employee uniforms.

While substantial evidence supports the Board's decision that St. Francis engaged in misconduct by prohibiting certain Union pins, this finding alone would be insufficient to set aside the first election. Again, however, we consider this misconduct as part of the totality of circumstances surrounding the first election.

## E.

## St. Francis's Enforcement of its No-Solicitation Policy

### 1.

St. Francis had a no-solicitation policy prohibiting employees from:

sell[ing] or distribut[ing] material of any kind, including, but not limited to: leaflets, advertising material, tickets, subscriptions, and cards, to any other employee when either employee is on work time. Nor shall any employee sell or distribute material of any kind at any time in any work area of the facility.

The policy also prohibited all solicitation, distribution, and sales in "patient care areas," defined as:

patient/resident rooms, physical therapy, occupational therapy, therapeutic recreation and other treatment rooms, and hallways and corridors adjacent to any of those rooms; sitting or waiting rooms and lounges on patients/residents floors that are accessible to and used by patients/residents; the dining room and elevators.

Storer testified that St. Francis prohibited the posting of any pro-Union or anti-Union literature "throughout the building" during the campaign. He also testified that after he learned about the anti-Union postings from his secretary, he instructed managers and directors to remove such materials if they saw them. Nevertheless, several employees testified that they regularly observed anti-Union fliers and posters throughout the facility. One employee testified that she saw the personnel manager walk past several pieces of anti-Union literature without removing them. The Union also presented evidence that St. Francis tolerated solicitations for other products and causes, such as Avon products, school benefits, and raffle ticket sales for outside organizations.

The hearing officer found that although St. Francis's no-solicitation policy was otherwise valid, St. Francis enforced the policy in a discriminatory manner by regularly permitting other types of solicitation in the facility and tolerating the posting of anti-Union literature.

### 2.

St. Francis maintains that it enforced its neutral no-solicitation policy consistently in prohibiting the posting of both Union and anti-Union literature at its facility. St. Francis also contends that because the anti-Union literature introduced during the hearing was not posted in patient care areas, and there was no evidence that the literature was posted during "work time," the postings did not violate the no-solicitation policy. In any event, St. Francis insists it did not